2025 IL App (1st) 241351-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

FIRST DIVISION
December 1, 2025

No. 1-24-1351

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| LUCILA ABRAHAM and JOSE ABRAHAM, Individually and as Parents and Next Friends of Rafael Abraham, a disabled minor, | ) ) ) ) | |
| Plaintiffs-Appellees, | ) ) ) | Appeal from the Circuit Court of Cook County |
| v. | ) ) | |
| ADVOCATE HEALTH AND HOSPITALS CORPORATION, d/b/a Advocate Christ Medical Center and/or Advocate Children's Hospital, CHAWKI EL-ZEIN, M.D., SUJATA SUBRAMANIAN, M.D., CHIKE B. GWAM, M.D., and MIDWEST ANESTHESIOLOGISTS, M.D., | ) ) ) ) ) ) ) ) ) | No. 19 L 14354 The Honorable Daniel A. Trevino, Judge Presiding. |
| Defendants-Appellants. | ) | |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Howse and Cobbs concurred in the judgment.

**ORDER**

¶ 1     *Held:* The trial court's entry of judgment on the verdict in favor of the plaintiffs and against the defendants in this action for medical negligence is affirmed.

¶ 2     The defendants, Advocate Health and Hospitals Corporation (Advocate) and Chawki El-Zein, M.D., appeal and seek a new trial in this medical negligence case following a jury verdict in

favor of the plaintiffs, Lucila Abraham and Jose Abraham, individually and as parents and next friends of Rafael Abraham, a disabled minor.[1] For the reasons that follow, we affirm the judgment of the trial court.

¶ 3                                    I. BACKGROUND

¶ 4        On August 1, 2013, the plaintiffs' four-month-old son (hereinafter the minor plaintiff) underwent surgery at Advocate Children's Hospital to correct a congenital heart condition known as a coarctation of the aorta. This surgery was performed by defendant Dr. El-Zein, a pediatric cardiothoracic surgeon, with perfusion provided by Cindy Urbas, a pediatric cardiac perfusionist. Following that surgery, the minor plaintiff remained hospitalized for five days. It was disputed at trial whether the minor plaintiff exhibited any movement of his lower extremities during that hospitalization. On August 6, 2013, he was discharged home into his parents' care. On August 19, 2013, he was brought back to Advocate Children's Hospital after his mother continued to notice that he did not appear to be regaining movement of his lower extremities following discharge. Following a workup, the minor plaintiff was diagnosed with paraplegia as a result of a spinal cord infarction.

¶ 5        In 2019, the plaintiffs filed the present action against defendants Advocate and Dr. El-Zein, alleging that their medical negligence during the surgery of August 1, 2013, was a proximate cause of the spinal cord injury and paralysis suffered by the minor plaintiff. The plaintiffs sought to hold Advocate vicariously liable both for the negligence of Dr. El-Zein and for the negligence of Urbas. Generally speaking, the plaintiffs' allegations of negligence were that the defendants failed to adequately protect the spinal cord during surgery, failed to properly perfuse blood to the lower

_____

[1] Sujata Subramanian, M.D., Chike B. Gwam, M.D., and Midwest Anesthesiologists, Ltd., were previously named as defendants but are not parties to this appeal.

body during surgery, and that they had failed to respond to multiple indications during surgery that perfusion was inadequate. They further alleged that Dr. El-Zein had failed to lower the minor plaintiff's body temperature during surgery to the extent necessary to protect the spinal cord and that Urbas had failed to communicate the perfusion status to the surgical team at critical points of the surgery.

¶ 6        In December 2023, the case proceeded to trial. During jury selection, the defendants moved to strike two prospective jurors for cause on the basis of equivocal answers given during *voir dire* about whether they could set aside their own life experiences, decide the case based upon the evidence presented, and be fair to both sides. The statements by one of the jurors, Noelia Olmos, involved a cousin whose son had Down syndrome. The statements by the other juror, Karina Rivera, involved her work with a nonprofit organization that provides services to immigrants and people with disabilities. The trial court denied the defendants' cause challenges as to both jurors. When the defendants thereafter sought to exercise peremptory strikes against these same prospective jurors, the plaintiffs raised a challenge that their attempt to do so was purposeful discrimination on the basis of race as prohibited under the principles of *Batson v. Kentucky*, 476 U.S. 79 (1986). The trial court granted the plaintiffs' *Batson* challenges and prohibited the defendants' exercising of peremptory strikes against Olmos and Rivera, both of whom then served on the jury in this case. We set forth in greater detail in our analysis below the facts surrounding the issues of jury selection that are pertinent to this appeal.

¶ 7        The trial of this case lasted over two weeks, during which time the jury heard the testimony of 23 witnesses. We summarize the trial evidence and testimony relevant to the issues raised on appeal as follows.

¶ 8        The plaintiffs presented the testimony of Winfield Wells, M.D., a pediatric cardiothoracic

surgeon working at the Children's Hospital of Los Angeles. Dr. Wells explained that the condition requiring surgery in this case, coarctation of the aorta, is a narrowing of a portion of the aorta that restricts blood flow. The surgical repair involves taking out the narrowed segment, putting it back together, and adding a patch that widens it. This particular surgery also involved widening the arch of the aorta to ensure that it did not become a future site of obstruction.

¶ 9    To perform this surgery, a clamp is placed across the aorta at the site of the narrowing to stop blood flow and allow it to be opened and repaired. Once that clamp is in place, blood supply to the lower body must come from the collateral blood vessels. In this case, Dr. El-Zein placed a line into the minor plaintiff's posterior tibial artery for the purpose of measuring blood pressure to the lower body during surgery. When the surgery started, that line was functioning, and blood pressure readings were recorded; during the procedure, however, Dr. El-Zein's operative report reflects that the posterior arterial line "dampened," indicating a lack of pulsatile blood flow. Dr. Wells testified that this dampening indicated that the minor plaintiff's blood pressure was so low that it was not even being recorded in the anesthesia or perfusion records. This meant that the quality of the minor plaintiff's blood flow through the collateral vessels was not good. It also meant that the surgery was performed without any measurements from the posterior tibial arterial line as to what the blood pressure was in the lower body. A second line was later placed into the innominate artery; however, Dr. Wells testified that the placement of that line into the innominate artery provided no information about how much blood was getting to the artery of Adamkiewicz, which is the collateral artery that supplies blood to the lower portion of the spinal cord. This information could have been obtained by placing a pressure monitoring catheter into the descending aorta beyond the point where the clamps had been placed. However, in this case Dr. El-Zein did not do anything to attempt to determine blood flow into the lower body. Dr. Wells testified not obtaining this

information as to the amount of blood pressure in the lower body was a deviation from the standard of care.

¶ 10    Dr. Wells also testified that Dr. El-Zein and the surgical team deviated from the standard of care in this case by failing to take adequate measures to protect the minor plaintiff's spinal cord from stroke. He explained that the surgery involved the minor plaintiff being placed on cardiopulmonary bypass, or a heart-lung machine, which allowed the flow of blood through the body to be controlled during the surgery by turning a dial up or down. It also enabled the minor plaintiff's temperature to be controlled by either refrigerating or warming the blood that was pumped through the body by the machine. The blood can be cooled to very low temperatures, and this deep hypothermia protects the body's tissues in the event of inadequate flow by reducing metabolism and thereby reducing the amount of oxygen and nutrients those tissues need. Dr. Wells testified that the standard of care required Dr. El-Zein, inasmuch as he lacked information that blood pressure was sufficient to the lower body, to take these other protective measures of cooling the tissues or increasing flow. Dr. Wells could see nothing from the records indicating any of these things occurred, and this was a deviation from the standard of care.

¶ 11    Dr. Wells testified that Dr. El-Zein had instead used a technique of sending blood only into the upper part of the body and relying upon the collateral blood vessels to bring blood to the lower part of the body. This occurred through placement of a cannula at the base of the innominate artery. Dr. Wells testified that the part of the operation to repair the aortic arch was 31 minutes (of a surgery that was 157 minutes total). For only 10 of those 31 minutes, Dr. El-Zein also placed a very small cannula into the descending aorta to attempt to bring some blood flow to the lower body. For the remaining 21 minutes, there was no blood flow to the lower body other than that occurring through the collateral vessels. Dr. Wells testified:

"Q. Is there any approved testing, animal studies, any approved IRB [(institutional review board)] testing for this technique that was being utilized on [the minor plaintiff]?

A. Well, I think the answer would be there certainly has been literature that's been written about a similar technique, but exactly the technique used here, I'm not aware that there is any published literature.

Q. What I'm getting at is in opening statement, *** the defense attorney stated to the jury that this technique has been tested and approved. Is that accurate?

A. No. No."

¶ 12    Dr. Wells testified that it was unknowable how much blood flow was getting to the lower body, and he had no answer to why the cannula was placed into the descending aorta for only 10 minutes. Dr. Wells testified that the general technique that Dr. El-Zein used, when done properly, is within the standard of care. But Dr. El-Zein did not do the technique properly in in this instance, because "there was nothing done to ensure that there was adequate blood flow getting to the lower part of the body, particularly during the 31 minutes that this aortic arch and coarctation was being repaired." Dr. Wells testified that this was below the standard of care.

¶ 13    Dr. Wells testified that in his practice of performing aortic arch repair, he cools the body to 18 degrees centigrade. At that low temperature, blood flow can be stopped completely, but the metabolism of the tissues is reduced to such a low level that they can tolerate long periods with no blood circulation. That technique is called "deep hypothermia and circulatory arrest." Dr. Wells testified that Dr. El-Zein started this surgery by cooling the patient to only 28 degrees, and then he raised the body temperature to 32 degrees for the second stage in which the aortic arch repair was done. Dr. Wells testified that the cardiac index, which is a measurement of the amount of flow circulating relative to the size of a child, was 1.6 per meter-squared per minute during the second

stage of the procedure when the body temperature was at 32 degrees. Dr. Wells testified that this cardiac index of 1.6 was far below optimal full flow, which for this patient was 2.5. Flowing the blood at an index of only 1.6 reduced the amount of oxygen and other nutrients reaching the tissues and was an additional factor that could account for injury to the spinal cord. Dr. Wells testified that if Dr. El-Zein was going to raise the body temperature to 32 degrees, he was obligated to order an increase in flow that was closer to the normal 2.5.

¶ 14    Dr. Wells testified that the cause of the minor plaintiff's spinal cord infarction was insufficient blood flow going to the lower body in a situation where collateral circulation, which the defendants were depending on to get blood to the lower body, was poor. The result of that was low blood flow to the lower body and spinal cord, which resulted in an ischemic injury to the spinal cord. Dr. Wells testified that the deviation from the standard of care by Dr. El-Zein and his surgical team was the cause of the minor plaintiff's spinal cord infarction. He found no evidence of infection or of any other competent cause for the spinal cord infarction besides medical negligence in the surgery at issue.

¶ 15    The minor plaintiff's medical records were admitted into evidence during the testimony of Dr. Wells. Plaintiffs' counsel questioned Dr. Wells as to the contents of certain records from the minor plaintiff's hospitalization at Advocate Children's Hospital beginning August 19, 2013. Several of these records included references that, for example, the impressions of treating physicians were that the minor plaintiff " 'has spinal cord injury likely secondary to his surgery.' " Dr. Wells testified that "secondary to surgery" meant "that the injury occurred during this surgery."

¶ 16    Cynthia Yarger, R.N., was called by the plaintiffs in their case-in-chief. She was one of the nurses at Advocate Children's Hospital involved in the postsurgical monitoring of the minor plaintiff in the pediatric surgical heart unit. Yarger conducted a head-to-toe assessment of the

minor plaintiff every two hours from 8 a.m. to 6 p.m. on August 3, 2013, and again at 8 a.m. on August 4, 2013. Yarger testified that the "neurological assessment" portion of her charting at each of these timeframes reflected that in both lower extremities, the strength was "strong," tone was "normal," movement was "spontaneous," and sensation was "intact." However, at the same timeframes, the "cardiovascular assessment" portion of her charting reflected no movement in the left lower extremity. Yarger agreed that the nurse who assessed the minor plaintiff overnight between her shifts had charted the same way, as did the nurse from the general pediatric floor to whom Yarger had handed off care midmorning on August 4, 2013.

¶ 17    Yarger's testimony was that her documenting of no movement in the left lower extremity in the cardiovascular portion of her charting had been a mistake or error, and the normal findings in the neurologic portion of her charting had been accurate. Yarger agreed in her testimony that the surgical team expected the nurses to report abnormal findings as to movement in the lower extremities. She was asked if it would be "below the standard of care" if she failed to report such a finding, and the trial court sustained an objection to this question. Asked instead if it would be contrary to her professional obligations as a nurse to fail to report, she answered that she "would be doing a poor job if I did not report a change."

¶ 18    On examination by defendants' counsel, Yarger testified that any lack of movement in the patient's lower extremities would have been an abnormal finding that would have been documented in the chart. She testified that not only would she have noticed this issue, but that the multiple physicians, fellows, and nurses were also conducting hands-on examinations of this patient, making it highly unlikely that a complete lack of movement would have gone unnoticed. She testified that she would have noticed a lack of movement in the lower extremities when changing the patient's diaper. She testified that a lack of movement in the left lower extremity

would have been "100 percent" obvious when she removed the line that had been inserted into his posterior tibial artery and cut the sutures.

¶ 19    Lawrence Vogel, M.D., is a pediatrician at Shriners Hospital who treated the minor plaintiff beginning the month after surgery and continuing through his retirement in 2017. Dr. Vogel testified that it was his opinion to a reasonable degree of medical certainty that the minor plaintiff sustained spinal cord damage at the time of his surgery. This was based in part on the location of the MRI changes between levels T9 and T11 of his thoracic spine in the region of the artery of Adamkiewicz. Dr. Vogel testified that he did not see any evidence that the minor plaintiff had any type of infection that would have caused his spinal cord injury.

¶ 20    Ricardo Senno, M.D., is a physical medicine and rehabilitation physician who specializes in brain and spinal cord injuries. He presented expert testimony as to the minor plaintiff's future prognosis and life-care needs. Dr. Senno testified that the medical records from Advocate indicated that the onset of the stroke in this case was " 'secondary to probable watershed infarct from compromise to the radicular artery of Adamkiewicz.' " This meant that the stroke was caused by compromise to the artery of Adamkiewicz, which supplies blood to the lower spinal cord. Dr. Senno testified there was no evidence of any infectious etiology causing this stroke.

¶ 21    Stephen T. Glass, M.D., is a pediatric neurologist who testified as a causation expert. He testified that the spinal cord injury in this case occurred intraoperatively on August 1, 2013. He testified that the MRI imaging taken August 19, 2013, showed signal abnormality in the area of stroke from T11 to the conus. It does not show findings indicative of active interruption of the flow of particles within the spinal cord, and this finding is consistent with an event that preceded the MRI imaging by at least 10 to 12 days. He testified that inadequate perfusion of the blood to the spinal cord is an explanation for the stroke. There was no evidence that it was caused by trauma,

genetic abnormality, or a blood clot. There was also no evidence suggesting that it was caused by a rare enterovirus known as acute flaccid myelitis, which would have presented differently than the symptoms experienced by the minor plaintiff in this case.

¶ 22     Plaintiff Lucila Abraham testified that she never saw the minor plaintiff move his legs after the surgery of August 1, 2013. When she would change his diaper, he would not kick as he had done prior to the surgery. During her testimony, two videos were admitted into evidence that she had taken of the minor plaintiff on August 3, 2013, and August 4, 2013. She testified that these videos showed that he was moving his arms but that there was no movement of his legs or feet. It did not appear that the blanket covering his legs had been moved from the way the nurses had placed it. She testified that she was concerned about the lack of movement by August 6, 2013, when his discharge was scheduled, and she talked to a nurse about her concerns. The nurse told her that there was not a doctor available at that time but that she could speak to a charge nurse about it. She testified that the charge nurse told her that it was normal for the baby not to move his legs following open heart surgery and that it was not something to worry about.

¶ 23     When his movement had not recovered by August 19, 2013, she took him back to Advocate Children's Hospital. She testified without objection that she learned following the MRI that he had suffered a stroke in his spine at some point during his recent surgery. She testified that she thereafter took him to be seen by Dr. Vogel. Over a hearsay objection, she testified that Dr. Vogel "kind of told me the same thing that I was already told, that he had a stroke through his spine." No physician has ever told her that her son had an infection or acute flaccid myelitis.

¶ 24     Plaintiff Jose Abraham also testified over a hearsay objection that his wife had told him that she had mentioned to the nurses her concern that their son was not moving his legs prior to his discharge from the hospital. He testified that she told him that the nurses had told her this was

normal after this kind of surgery. He testified that when she told him that, he felt better.

¶ 25     The defendants presented the testimony of Sheila Wood, R.N., another nurse involved in the postsurgical care of the minor plaintiff in the pediatric surgical heart unit. Wood testified that at 8 p.m. on August 2, 2013, she conducted a neurologic assessment that showed weak strength in all four extremities, which was not abnormal in a baby who had undergone cardiac surgery one day earlier. She assessed tone as normal and movement spontaneous in both lower extremities. She also checked his posterior tibial line at that time, and it would have been evident if there was a lack of movement in the legs during that examination. Lack of movement would also have been evident when she changed the baby's diaper. Her findings were consistent at the next assessment at 10 p.m. In the next assessment at midnight, she assessed strength as "strong," which was a positive progression. She made consistent assessments at 2 a.m. and 6 a.m. on August 3, 2013. She testified that there were no abnormal findings that would require her to notify a physician. She acknowledged, however, that her cardiovascular assessments at the above times indicated no movement of the left lower extremity.

¶ 26     On cross-examination, Wood confirmed that every cardiovascular assessment that she charted showed that the patient was not having any movement in his left lower extremity. This was inconsistent with every neurological assessment that she charted, in which she documented that he had movement in both legs. She does not know if these chart entries were intentional or a mistake. She was asked without objection whether she would have been required to escalate a finding that the minor plaintiff did not have movement of his left lower extremity. She answered that she would have been required to do so and that she would have wanted to do so. She also acknowledged that there was a process for nurses to review their charting and make corrections and that at no time did she ever rectify any mistakes in her charting.

¶ 27     Daniel Licht, M.D., is a pediatric neurologist at Children's National Hospital in Washington, D.C., who expressed causation opinions on behalf of the defendants. Dr. Licht's testimony was that the plaintiffs' theory that the spinal cord infarction at issue was the result of minimal to no blood flow to the lower body during the surgery of August 1, 2013, was "not possible." He testified that this theory of causation advanced by the plaintiffs could not be true because there is no evidence in this case of injury to the kidneys or liver, which are the main organs reliant upon lower-body blood flow for oxygen. He testified that, particularly in a baby, the spinal cord receives blood flow at every segment and that it would thus receive flow from the top down even in the event of no flow to the artery of Adamkiewicz. By contrast, there is no collateral circulation into the kidneys or liver. Dr. Licht disagreed that the spinal cord was more sensitive to a lack of blood flow than the kidneys, because the oxygen demand of the spinal cord is quite low. He also testified that if there was a spinal cord injury from no direct or collateral blood flow to the lower body, he would expect the location of it to be at the midzone between upper body circulation and lower body circulation. He also testified that paralysis would be noticeable within 30 minutes.

¶ 28     Dr. Licht was also asked on direct examination whether he had considered possible alternatives that might explain the outcome of spinal cord injury that occurred in this case. He answered that every summer between 2012 and 2015, there had been children that developed polio-like illnesses from an infection of the spinal cord by a mutated enterovirus that has since disappeared. The name of that condition was acute flaccid myelitis, and the children who developed this condition did not always have acute illness. It was not until 2014 when a test became available for it, and Dr. Licht found no evidence that the minor plaintiff had any acute illness with his paralysis. Dr. Licht's testimony concluded on this topic:

"Q. I want to be fair about this and make sure we're fair and complete. Are you telling

the jury that you're a hundred percent certain that this is acute flaccid myelitis, and that's what caused this paralysis in this case?

A. No.

Q. Why are you offering acute flaccid myelitis as a possibility that it could have occurred in this case, if you can't be a hundred percent sure?

A. Because mostly I can't explain the injury by a vascular mechanism. By that, I mean blood flow oxygen delivery, so then you have to go looking for other explanations. What sort of things happen to the spinal cord are inflammatory, infectious, and oncologic process. Oncologic meaning cancer. There's no evidence of a cancer on the MRI. So then you're left with just inflammation or infection. I think there's a reasonable explanation in infection.

Q. Between those two possibilities, let's say there's no direct flow to the lower body, there's little or no collateral circulation to the body that somehow only affects T-11 to the conus and spares everything else, on the other hand something like an infectious cause that you talked about, which is more likely?

A. Right, so I mean all things are unlikely, including injury to the spinal cord. It happens very rarely in pediatrics. It does happen, but very rarely.

So we're talking about the least likely versus things that happen very rarely, but I think infection is probably a better explanation for what happened to this child's spinal cord than a vascular accident.

Q. Is that in part based on your opinion regarding the likelihood or unlikelihood of the plaintiff's theory of the case?

A. Correct."

¶ 29    On cross-examination, Dr. Licht was asked if he was aware of literature that contradicted his

opinion that the spinal cord is not more sensitive to lack of blood flow than other organs. He answered that he was not. He was shown a 2009 article from the European Journal of Cardiothoracic Surgery, and he agreed that journal was reasonably reliable. He agreed that he saw where that article stated that among the organs not perfused during selective cerebral perfusion, the spinal cord is unquestionably the organ most sensitive to ischemia. Dr. Licht then asked plaintiffs' counsel about the population to which the article referred—whether it was adult, pediatric or neonatal—and plaintiff's counsel stated "Both. It's all." On redirect examination, defendants' counsel elicited that the subjects of the 2009 study had been juvenile Yorkshire pigs that had been exposed to 90 minutes of selective cerebral perfusion at 28 degrees. Dr. Licht testified that this article provided no insight into this case in which the period of selective cerebral perfusion had been only 21 minutes.

¶ 30        James Hammel, M.D., is a pediatric cardiac surgeon at the Helen DeVos Children's Hospital in Grand Rapids, Michigan. Dr. Hammel testified that Dr. El-Zein complied with the standard of care in all aspects of performing the surgery of August 1, 2013. Pertinent to this appeal, Dr. Hammel testified that over the past 20 to 25 years, there have been "several changes or, say, additional techniques that have been developed" for performing aortic arch repair, and there was no single technique required of all surgeons. One technique available in 2013 was "deep hypothermia with circulatory arrest," but a different technique of more recent development was used in this case called "selective cerebral perfusion." Under that technique, to protect the infant's brain, one of the arterial tubes from the heart-lung machine is placed into an artery that delivers blood flow selectively to the brain during the period of the surgery when the patient would otherwise be on total circulatory arrest so the aortic arch could be repaired. This portion of the procedure was done at a temperature of 28 degrees, which constitutes "moderate," not deep,

hypothermia. Dr. Hammel expressed the opinion that it was within the standard of care to perform the selective perfusion portion of the arch-repair procedure at 28 degrees.

¶ 31    He explained that selective cerebral perfusion occurred for 21 minutes of this surgery. This consisted of a period of 18 minutes wherein they prepared the arch. Then for a period of 10 minutes (while the patch was sewed), a cannula was also placed through the unfinished opening of the arch and passed into the descending aorta that perfused the lower body. Then for the last 3 minutes that cannula was removed, and the opening was stitched closed. All of this was done at a temperature of 28 degrees. This technique was within the standard of care. However, it is different than Dr. Hammel's own technique, in which "there is no time where we are only on selective cerebral." Instead, under his technique, he lifts the heart and inserts a cannula into the descending aorta so that blood flow is provided throughout the entire lower and upper body on a continuous basis. Under his own technique, Dr. Hammel "barely cool[s] the patients at all." He uses 32 or 34 degrees, which would constitute "mild" hypothermia. Dr. Hammel testified that the reason surgeons including himself and Dr. El-Zein were moving away from the use of deep hypothermia with circulatory arrest toward techniques that use only moderate or mild hypothermia and that allow for continuation of blood flow was to avoid problems with swelling, suppression of the immune system, clotting, and other risks associated with the use of deep hypothermia with circulatory arrest.

¶ 32    On cross-examination, Dr. Hammel was asked whether he had disclosed any medical literature in support of his opinions. He answered that he had not. He also agreed that he could not cite any paper in support of his opinion that moderate or mild hypothermia is equal to or superior to the use of deep hypothermia in protecting the spinal cord. He disagreed that as of 2013, the medical literature described deep hypothermia as the gold standard for aortic arch repair. Plaintiffs'

counsel attempted to impeach his testimony on this point but was unable to establish a foundation with the witness that a certain article published by Duke University in 2013 was reliable. The following exchange then occurred:

"Q. I get that in 2013 you and some other doctors were experimenting and doing other techniques. My point is—

MR. PINTO [(DEFENDANTS' ATTORNEY)]: Object to form.

THE COURT: It's overruled.

BY MR. BLANDIN [PLAINTIFFS' ATTORNEY)]:

Q. —in 2013 you and other doctors like Elzein were experimenting with children, weren't you?

A. No. We were not experimenting.

Q. None of your studies were based on animal studies or data or anything. You were going through and doing techniques and seeing what happened and then reporting on it; right?

A. We were not experimenting. We were—

Q. That's what you were doing. You had not done any tests on guinea pigs or other animals. You just went ahead and did it; right?

A. No. We—

Q. Did you do any testing, sir, on animals before you stopped using the gold standard of deep hypothermia?

A. Again, deep hypothermia was not the gold standard in 2013.

Q. Did you do any testing on animals—

A. Lots of testing on animals was done by other institutions.

Q. Did you do any testing on animals before you came up with your technique?

A. No.

Q. Did Dr. Elzein do any testing on animals before he came up with his technique?

A. I am not aware if he did."

¶ 33    Dr. Hammel was also questioned on cross-examination about the same article from the European Journal of Cardiothoracic Surgery about which Dr. Licht had been questioned. Dr. Hammel also agreed that it was a reasonably reliable and authoritative journal. The article addressed the topic of whether the spinal cord was protected during selective cerebral perfusion performed at 28 degrees. The following exchange occurred during questioning about this article:

"Q. All right. We can continue onto the end of the paragraph and onto the next page. And it reads, [']since there has been no clinical experimental studies assessing the safe limits of prolonged selective spinal perfusion, moderate hyperthermia with regard to spinal cord recovery, they sought to compare the outcomes of different durations at core body temperatures of degrees in the same porcine survival model that's been used in the previous studies to explore other aspects of cerebral physiology in their laboratory.[']

What they're trying to do is test out the safety of doing this surgery at 28 degrees, correct?

A. In pigs who don't have aortic disease.

Q. Right.

A. For vastly longer durations of ischemia.

Q. That's right. This study is being done on pigs back in 2008 because nobody had established that it was safe to do in humans, right?

A. That is not correct.

Q. Okay. Are you aware of any human studies where they were experimenting to make sure that it was safe?

A. I am not aware of a human study designed to show that it was safe.

Q. That would be—

A. But it was an innovation that consisted of adding a safety measure to a standard practice."

¶ 34    Following a question about whether the article also cited authority that models had demonstrated that spinal cord perfusion and collateral flow in pigs behaved similarly to that observed in humans, Dr. Hammel stated that he was not familiar with the studies cited. He disputed whether he had any obligation to read them prior to coming to testify and stated that his understanding was only that he was supposed to bring his experience and share it. This prompted the following question:

"Q. You're just telling the jury your experience where you've done no experiments other than your innovations on little babies?

A. Hundreds of operations using these and other techniques.

Q. Right.

A. Without any incidence of spinal ischemia."

Dr. Hammel agreed that under his own technique that he used as of 2013, perfusion would have been provided for the entire time the minor plaintiff was on cardiopulmonary bypass due to the use of a cannula down the descending aorta; whereas Dr. El-Zein's technique had a cannula in place there for only 10 minutes.

¶ 35    On redirect examination, Dr. Hammel testified that he did not believe that he had been

experimenting on patients by performing aortic arch repair using the selective cerebral perfusion technique. Asked to explain why this was his belief, he stated that it was an "innovation" on an established technique by which he "figured out some additional facilitating techniques that made it easier, less impactful on the patient and more widely popularized."

¶ 36    Dr. Andrew Van Bergen is a pediatric cardiologist who was the minor plaintiff's attending physician at Advocate Children's Hospital on August 5, 2013, and August 6, 2013. He described the nature of the physical examination that he would have conducted and that it would have involved assessment of the patient's lower extremities. On both dates, he assessed the minor plaintiff as moving all extremities equally. Asked if he could have just missed or failed to recognize the fact that the minor plaintiff was not moving his lower extremities on the day of discharge, he answered, "I don't have any idea how that would be possible in a child."

¶ 37    On cross-examination, plaintiffs' counsel sought to question Dr. Van Bergen with medical literature on the general topic of medical mistakes and errors. Outside the presence of the jury, the trial court sustained an objection to the use of this literature. Plaintiffs' counsel then asked whether he was aware that medical errors are made every day at his hospital. The trial court overruled an objection to this question, and the witness answered that he was aware of this. Plaintiffs' counsel also confirmed that he was not involved with the minor plaintiff's care upon his readmission to the hospital on August 19, 2013, but that he has had some involvement with him after that time. Dr. Van Bergen was asked if he had talked to any of the doctors from Advocate who were involved in determining why the paralysis had occurred or reviewed any records from August 19, 2013, and he testified that he had not. Plaintiffs' counsel concluded his questioning on this topic with the comment, "I guess we'll have to wait to hear from them." There was no objection.

¶ 38    The trial court instructed the jury on proximate causation consistent with the 2021 revisions

to the Illinois Pattern Jury Instructions, Civil, on this topic. See Ill. Pattern Jury Instructions, Civil, No. 15.01 (rev. Aug. 2021) (hereinafter IPI Civil No. 15.01). In doing so, the trial court rejected a modified version of this instruction tendered by the defendants that substituted its last sentence with the language on "sole proximate cause" that, prior to 2021, was included in the "long form" of former Illinois Pattern Jury Instruction, Civil, No. 12.05 (approved Dec. 8, 2011, withdrawn Aug. 2021) (hereinafter former IPI Civil No. 12.05).

¶ 39　　　The aspects of both sides' closing arguments pertinent to the issues raised on appeal are set forth in our analysis below. Following closing arguments, the jury returned a verdict in favor of the plaintiffs and against both defendants in the amount of $40 million. The defendants filed a timely posttrial motion for new trial, which the trial court denied. This appeal followed.

¶ 40　　　　　　　　　　　　　　　　　II. ANALYSIS

¶ 41　　　　　　　　　　　　　　　　　A. Jury Selection

¶ 42　　　The defendants' first argument on appeal is that the trial court's errors in jury selection deprived them of a fair and impartial jury. First, they contend that the trial court erred by denying their cause challenges involving Olmos and Rivera after both prospective jurors equivocated during *voir dire* about whether they could fairly and impartially decide the case based upon the evidence and indicated that sympathy and emotion would unduly influence their verdict. Second, they contend that the trial court compounded that error by upholding the plaintiffs' *Batson* challenges to the defendants' attempted exercise of peremptory strikes as to these two jurors.

¶ 43　　　　　　　　　　　　　　　　　*1. Facts*

¶ 44　　　Placing the above arguments in context requires a detailed recitation of certain facts of jury selection in this case.

¶ 45　　　The challenges at issue concerning Olmos and Rivera occurred on the second day of jury

selection. The previous day, the defendants exercised their first two preemptory strikes of prospective jurors. The first peremptory strike was exercised as to Jacqueline Corderro, a Hispanic female. That peremptory strike of Corderro was exercised without any challenge from the plaintiffs.

¶ 46     The defendants' second peremptory strike was exercised with respect to a prospective juror named Ana Mora, who was also a Hispanic female. After the defendants exercised this strike of Mora, plaintiffs' counsel raised the first *Batson* challenge of this case. Plaintiffs' counsel argued that the peremptory strike of Mora was the second instance in which the defendants had exercised a peremptory strike to remove a prospective juror who was the same race as the plaintiffs. Plaintiffs' counsel argued there was no basis for removing Mora other than race, as she had stated she could be fair to both sides. Plaintiffs' counsel also pointed out to the trial court that the defendants' paperwork had "red circles that are placed around the Hispanic women on the venire." Defendants' counsel stated that his race-neutral reason for challenging Mora was that her work involved children with disabilities. Plaintiffs' counsel argued that the defense had accepted another (presumably non-Hispanic) juror despite that juror's wife also working with disabled children.

¶ 47     At that point, the trial court took a brief recess to review the law involved in a *Batson* challenge. After doing so, it first recited the law that a *Batson* challenge involves a three-step analysis. The trial court stated that the first two steps had been met: the plaintiffs had made a *prima facie* showing that the defendants had exercised a peremptory challenge on the basis of race; and the defendants had proffered a race-neutral reason for striking Mora, which was that she worked with disabled children similar to the minor plaintiff. The trial court then stated that the third step was to determine whether the moving party had carried its burden of establishing purposeful discrimination.

¶ 48    Significant here, after recognizing that the plaintiffs had made a *prima facie* showing and that the defendants had proffered a race-neutral explanation, the trial court stated that "[t]here's a list of factors relevant to the determination." (See *infra* ¶ 84.) The trial court went step-by-step through seven factors and found that some of these factors had been shown. Among these were the fact that the defendants were exercising a strike against a juror of the same Hispanic race as the plaintiffs and that, by that point in the case, the defendants had exercised a disproportionate number of preemptory strikes (both of the two exercised) against prospective jurors who were of the same race as the plaintiffs. However, the trial court ultimately found that it did not "have a really huge sample size yet" that would enable it to conclude that defendants' peremptory striking of Mora was purposeful discrimination on the basis of race.

¶ 49    The following day, plaintiffs' counsel posed a question during jury selection that touched upon the topic of immigration, which prompted the following exchange involving Rivera:

"MS. RAISH [(PLAINTIFFS' ATTORNEY)]: Ms. Rivera?

PROSPECTIVE JUROR: Yes. I work for a nonprofit, and we hold funds for disabilities (indiscernible) and we also have funds for immigration. So I do tend to be a bit biased when it comes to those topics simply because of my work and the people I work with and the citizens that we serve as a nonprofit. So I do tend to be geared towards the nonprofit sector when it comes to those type of sectors.

MS. RAISH: You have no reason to think that Jose and Lucy's family utilizes those services; you don't know them?

PROSPECTIVE JUROR: Uh-uh.

MS. RAISH: And we won't be bringing up any of those nonprofits or anywhere that you work. Given that and given that they are completely separate, would you be able to put

those experiences aside and just listen to the law and evidence in this case and be fair?

PROSPECTIVE JUROR: I would like to think so, but I can't tell you for certain until I'm in that situation where I'm hearing evidence, and that naturally will gear me towards my work.

THE COURT: Same question that I asked Ms. Rivera. So those items, those are not going to be issues that come before the jury all right? They're not an issue that you are going to decide on.

Everyone—so as I asked Ms. Rivera, we all have feelings, assumptions, maybe even biases. There's a jury instruction on this very topic. We're not asking anyone to erase those. That's impossible. But what we're asking is do you have the ability to set those aside for the purposes of making your decision, to hear the evidence, the law, and the instructions, apply those to the—apply those items and then make your decision, can you do that?

PROSPECTIVE JUROR: I would like to think I can.

THE COURT: You say you would like to think?

PROSPECTIVE JUROR: To think I can, yes.

THE COURT: Can you do that?

PROSPECTIVE JUROR: I don't know if I can. I would like to think I can. I would like to say that I would, but...

THE COURT: Thank you."

¶ 50 Later during *voir dire* on the same panel, defendants' counsel posed a question to Olmos about a statement on her juror questionnaire that a cousin with whom she was close had a little boy with Down syndrome. Defense counsel asked whether she would be able to set that experience aside and listen to both sides of the case fairly. She answered:

"PROSPECTIVE JUROR: I mean, I believe I can, like everybody says. You know, I could say one thing, but when it comes down to it, I would hope I could do it. I mean, I tell myself yes, I can, but, you know, you can't—when it comes to your heart, you know—you just can't—you know, when it comes down to it. You know, I don't know how my heart is going to react, you know? I would say yes, that I would."

¶ 51       Following that question of Olmos, defense counsel asked another question to the venire on the topic of setting aside sympathy and listening to the evidence presented by both sides. At that point, the trial court interrupted with the following question:

"I'm going to jump in with a question. And I think I mentioned it before, is you'll likely receive an instruction that acknowledges that we all have feelings, assumptions, even biases. We just can't let those be the basis for your decision. Is there anyone here who cannot hear this with an open mind?

***

Anyone here who cannot have an open mind? We're not asking you to erase the feelings, assumptions, et cetera.

Showing no hands."

¶ 52       Based upon the answers by Olmos and Rivera above, the defendants moved to strike both of them for cause. As to both, defendants' counsel argued that their answers were too equivocal and uncertain about whether they could be fair to the defendants as well as to the plaintiffs. Defendants' counsel also referenced a statement by Olmos that she had a funeral to attend that would result in the trial being delayed by one day.

¶ 53       As to Olmos, the trial court noted that after her answer it had inquired of the entire panel whether there was anyone who could not hear the case with an open mind, and she had not raised

any concerns. The trial court stated that it had found that Olmos could be an open-minded and fair juror. The court also stated that there was some ambiguity about whether she truly needed to attend a funeral and that the plaintiffs' attorneys had indicated that they could work around that schedule if she were seated as a juror. On that basis, the trial court denied the cause challenge as to Olmos.

¶ 54        As to Rivera, the trial court stated that while it found that she might be someone who did not want to participate in jury service and might have "waffled" somewhat in her answers, she had also stated in questioning that neither side was ahead. The trial court stated that her answer had involved immigration, that it was not sure why she had been asked about that topic, but that it had clarified it was not going to be an issue in the case. The court accordingly denied the cause challenge as to Rivera.

¶ 55        Although not directly relevant to this appeal, two additional cause challenges were raised by the defendants to other prospective jurors on this panel. They raised a cause challenge as to a prospective juror named Luis Oliveres on the grounds that he had limited understanding of English. The trial court denied that challenge, stated that it perceived no difficulty understanding English in his written questionnaire or his answers to the attorneys' questions. The defendants also challenged for cause a prospective juror named Alyssa Hernandez on the grounds of a statement that her father was an immigrant and that would cause her to lean toward the plaintiffs. The trial court denied that challenge, stating that Hernandez had been fully rehabilitated after that and agreed she could be fair to both sides and hear the evidence with an open mind.

¶ 56        After all cause challenges had been resolved, the parties proceeded to exercise their peremptory challenges. The plaintiffs tendered a panel in which three of the four prospective jurors were Oliveres, Hernandez, and Olmos, with Rivera being the next prospective juror up for consideration after that. When that panel was tendered to the defense, defendants' counsel recited

the juror numbers of Oliveres, Hernandez, Olmos, and Rivera as being the jurors as to whom the defendants would exercise their next four peremptory strikes. In response to this statement, plaintiffs' counsel raised a *Batson* challenge, stating "all four are Hispanic." Plaintiffs' counsel argued that the defendants were continually seeking to exclude Hispanics from the jury, including by their two peremptory challenges the previous day, by their earlier cause challenges as to the same four prospective jurors, and now by the present peremptory challenges.

¶ 57    The trial court stated that it was going to "apply the same analysis as yesterday," including the "three-step process" and "all the factors that have to be shown." The trial court stated that it found the plaintiffs had made a *prima facie* showing of discrimination. It then proceeded to consider one-by-one the defendants' proffered race-neutral reason for striking each juror, beginning with Oliveres.

¶ 58    As to Oliveres, defendants' counsel's proffered race-neutral reason for striking him was that he had volunteered difficulty with understanding English, which would negatively affect his ability to consider this complicated medical negligence case. Plaintiffs' counsel responded that the court had already found that Olivares did not have a language barrier, and he urged the trial court to "look beyond the mere words of counsel to look at what's going on here" with the repeated attempts to exclude Hispanic jurors. The trial court reiterated that the previous day, it had considered factors including the types of jurors being targeted for challenges and the composition of the venire and of the jury, and it had found that there was not a track record of discrimination as of that point in the case. The trial court stressed the importance of considering each challenge one by one. It found that the defendants' exercising of a third peremptory challenge to excuse a Hispanic prospective juror was not yet enough to prove discriminatory intent. It thus denied the *Batson* challenge and allowed the peremptory strike as to Olivares.

¶ 59    The next prospective juror considered was Hernandez. Defendants' counsel's proffered race-neutral reason for striking Hernandez was that she had stated during questioning that she was leaning toward the plaintiffs' side. In response, plaintiffs' counsel again argued that *Batson* directs a trial court to consider whether the defendants' proffered reason is mere pretext for racial discrimination, and in this case a pattern was unfolding before the court of the defendants seeking to exclude jurors who were of the same Hispanic race as the plaintiffs. The trial court granted the *Batson* challenge as to Hernandez. In ruling, the trial court stated that it found that a pattern had been demonstrated by this time of the defendants' striking jurors on the basis of race. The trial court reiterated multiple times that it was considering the totality of the same factors it had considered on the previous challenges.

¶ 60    The arguments as to Olmos and Rivera were largely addressed together. Defendants' counsel stated that the defendants were going to "excuse Ms. Olmos, and to be fair, Ms. Rivera, for the reasons we previously argued and stated when we moved to challenge those two for cause." Defendants' counsel added that Olmos had a funeral to attend, which would push the trial back by one day. Plaintiffs' counsel stated that his argument was the same as before, that the proffered race-neutral reasons were pretextual in light of the practice of excluding Hispanic jurors that was occurring before the court.

¶ 61    In ruling, the trial court stated that "right now where it stands," the defendants had already attempted to exercise four consecutive peremptory challenges against prospective jurors who were Hispanic. The trial court recognized the scheduling issue with Olmos, but it stated that "you can provide a race neutral application [*sic*], but when I look at the pattern here and the factors and the venire and the jury and all those things that the law requires me to do," the *Batson* challenge to Olmos was sustained. "There's a pattern here. And I already heard the cause on her."

¶ 62    The defendants proceeded to address Rivera, arguing that she had stated that she could not be fair and was not rehabilitated on the record. Plaintiffs' counsel raised a *Batson* challenge for the same reasons previously articulated. The trial court stated, "[Y]ou've shown there's a race neutral explanation, but the totality of the circumstances doesn't change here. You're still doing the same thing. I already denied the motion for cause for that reason. *** And based on the Court's analysis of the totality of the factors, the *Batson* challenge is allowed and sustained."

¶ 63    Later that day, after being sworn as a juror, Hernandez asked to speak to the court. Among other things, she volunteered that upon reflection, "I wasn't being truthful *** about the evidence, that I would be open minded about it." The trial court found this volunteered statement to be too problematic to allow Hernandez to serve as a juror, and it discharged her for that reason.

¶ 64    The following day, the trial court heard argument on a motion to reconsider by the defendants pertaining to the seating of Olmos and Rivera as jurors. On the issue of the cause challenges, the defendants highlighted their specific statements above as taken from the transcript (*supra* ¶¶ 49-50) and argued that the statements demonstrated that neither of them could be fair. The trial court recited that its role was to decide, based upon the entirety of *voir dire*, whether a juror could be fair and impartial and that it was the burden of a challenging party to show bias, not mere suspicion of bias. After reviewing Rivera's statements from the transcript, the trial court found her statement—that she " 'would like to think' " she could set aside her own experiences, listen to the law and evidence of the case and be fair, but that she could not " 'tell you for certain until I'm in that situation where I'm hearing evidence' "—adequately showed that she was open to hearing the evidence and could be fair and impartial. As to Olmos, the trial court stated that although she made some prefatory comments in answering defense counsel's questions, her final answer was " 'yes, that I would' " when asked whether she could set aside her experience with her cousin's child and

listen to both sides of the case fairly. The trial court reiterated that it found that both jurors could be fair and impartial, and it denied the motion for reconsideration as to the cause challenges.

¶ 65    As to the *Batson* rulings, one part of the defendants' arguments for reconsideration was that the trial court had undertaken its *Batson* analysis improperly, specifically by finding that the plaintiffs had established a *prima facie* case of discrimination without considering the seven factors identified by the Illinois Supreme Court as pertaining to that first analytical step. They argued that, had the trial court properly considered these factors at the first step of the analysis, it would have found that those factors did not weigh in favor of a *prima facie* showing of discrimination, and thus it would never have proceeded to the second step of requiring the defendants to proffer a race-neutral reason for the strike. In denying the motion to reconsider on that aspect, the trial court reiterated multiple times that it had undertaken the proper *Batson* analysis. Specifically, the trial court stated that it had considered the various factors as going to the first step of the analysis and that it had done so prior to requiring a race-neutral reason under the second step.

¶ 66    As to the trial court's ultimate finding of discrimination, there was extensive argument by the parties concerning the overall racial composition of the venire and the jury and about whether any non-Hispanic prospective jurors had difficulties with understanding English but were not stricken. Plaintiffs' counsel also argued again that defendants' counsel had drawn circles on the juror cards of all the Hispanic women on the venire before they were even questioned, although the trial court stated that had not been something before it. In ruling on that aspect of the motion for reconsideration, the trial court acknowledged that the defendants had proffered a race-neutral explanation for the striking of Olmos and Rivera; but it reiterated that it found the defendants' striking of these two jurors nevertheless constituted "purposeful discrimination in that context in

that moment in time." The trial court added, "I didn't use those words. I agree with that, but by virtue of sustaining the objection, *** by operation of law, that's the finding." Accordingly, the trial court denied the motion to reconsider its ultimate ruling sustaining the *Batson* challenges concerning Olmos and Rivera.

¶ 67                              *2. Cause Challenges*

¶ 68       On appeal, the defendants first argue that the trial court's denial of their motions to strike Olmos and Rivera for cause was contrary to the manifest weight of the evidence. The defendants assert that both jurors expressed considerable doubt about whether they could set aside their emotions and biases and weigh the evidence fairly and impartially. They cite Olmos' experience of having a close cousin whose son has Down syndrome and Rivera's experience working for a nonprofit that serves immigrants and people with disabilities. The defendants argue that these jurors' answers were at best aspirational about whether they could be fair and impartial despite having personal experiences with persons in situations similar to the plaintiffs, toward whom they would be unfairly sympathetic.

¶ 69       Initially, the plaintiffs contend that we should treat this argument as forfeited by applying the rule that a trial court's failure to remove a juror for cause is grounds for reversal only where the party challenging for cause had exhausted all its peremptory challenges and was thus forced to accept a juror who should have been dismissed for cause. See *People v. Pendleton*, 279 Ill. App. 3d 669, 675 (1996). The plaintiffs point out that the defendants' motions to strike Olmos and Rivera for cause were made at a point when the defendants had not exercised all their peremptory challenges. The plaintiffs argue that the defendants could have exercised peremptory challenges as to Olmos and Rivera but for their attempt to do so in a racially discriminatory way in violation of *Batson*, as discussed below. We reject the plaintiffs' forfeiture argument. We find that the

defendants properly preserved this issue for appellate review by attempting to exercise peremptory challenges against these two jurors, even if they were unsuccessful in doing so.

¶ 70    Turning to the merits, the determination whether to excuse a prospective juror for cause is a matter in which the trial court is vested with great discretion. *Addis v. Exelon Generation Co.*, 378 Ill. App. 3d 781, 792 (2007). A prospective juror should be excused for cause when his or her state of mind is such that one of the parties will not receive a fair and impartial trial with that person sitting as a juror. *People v. Williams*, 173 Ill. 2d 48, 67 (1996); accord *Magna Trust Co. v. Illinois Central R.R. Co.*, 313 Ill. App. 3d 375, 390 (2000). The issue for the court is whether, when the entirety of the *voir dire* examination is considered, the person possesses the essential qualifications to be a fair and impartial juror despite the beliefs or life experiences that the person brings into jury service. See *Vrzal ex rel. Sorcek v. Contract Transportation Systems Co.*, 312 Ill. App. 3d 755, 758-59 (2000).

¶ 71    The party raising the challenge has the burden of showing the actual existence of a prospective juror's disqualifying state of mind that will raise the presumption of partiality. *People v. Johnson*, 149 Ill. 2d 118, 138 (1992) (hereinafter *Andrew Johnson*) (citing *People v. Cole*, 54 Ill. 2d 401, 413 (1973)). The existence of a disqualifying state of mind must be based on evidence, and the mere suspicion of bias will not suffice. *People v. Kuntu*, 196 Ill. 2d 105, 127 (2001); accord *Andrew Johnson*, 149 Ill. 2d at 138 (citing *Cole*, 54 Ill. 2d at 415). The mere fact that a prospective juror gave an equivocal response does not require that he or she be excused for cause. *Williams*, 173 Ill. 2d at 67. Likewise, absolute certainty is not required of prospective jurors in their responses. *Id.* (citing *Andrew Johnson*, 149 Ill. 2d at 138); accord *People v. Reid*, 272 Ill. App. 3d 301, 307 (1995) ("a juror's state of uncertainty does not necessarily mean the juror is unqualified to serve"). Because the trial court is in a superior position to observe the prospective juror's

demeanor and evaluate the candor of the responses, the trial court's determination will not be set aside on review unless it is against the manifest weight of the evidence. *Kuntu*, 196 Ill. 2d at 127.

¶ 72    Applying the above rules, we reject the defendants' argument that the trial court's refusal to dismiss Olmos and Rivera as jurors for cause was contrary to the manifest weight of the evidence. We find that the defendants fell far short of showing the actual existence in either juror of a disqualifying state of mind that raised a presumption of partiality. Instead, the defendants' arguments are little more than speculation of bias based upon what were effectively honest statements by these jurors that they would not know with certainty how their life experiences would influence their reactions to the evidence until it was presented to them. But both jurors positively expressed the expectation that, when the time came, they would be able to set their own life experiences aside and decide this case based upon the evidence presented.

¶ 73    As to Rivera, the trial court noted that she had been asked whether she would be able to put aside her experiences working for a nonprofit that holds funds for immigrants and those with disabilities, listen to the law and evidence in the case and be fair. She answered, "I would like to think so, but I can't tell you for certain until I'm in that situation where I'm hearing evidence." The trial court found this statement indicated that she was open to hearing the evidence and could be fair and impartial.

¶ 74    As to Olmos, the trial court noted that shortly after Olmos had given this answer, the trial court had inquired of the entire panel whether anyone believed that they could not set aside their own feelings, assumptions, or biases and hear the case with an open mind, and she had not raised any concerns. The trial court also noted that her final answer was " 'yes, that I would' " when asked whether she could set aside her experience with her cousin's child and listen to both sides of the case fairly.

¶ 75     The trial judge, who observed the demeanor of these two jurors in the context of the entirety of *voir dire*, specifically concluded that their answers indicated that they could be fair and impartial jurors. Under the law set forth above, we do not find that the trial court's determination on this point was contrary to the manifest weight of the evidence.

¶ 76     We reject the defendants' argument that a different result is required by *People v. Johnson*, 215 Ill. App. 3d 713 (1991) (hereinafter *Daniel Johnson*), or *People v. Delgado*, 231 Ill. App. 3d 117 (1992). In *Daniel Johnson*, this court reversed a murder conviction based in part upon the conclusion that the trial court erred in denying cause challenges against three jurors who "equivocated" about whether they could be fair and impartial. *Daniel Johnson*, 215 Ill. App. 3d at 724. One juror had answered " 'I hope not' " in response to a question about whether his ability to be fair would be affected by the fact that his sister and other family members had been victims of robbery. *Id.* A second juror had answered " 'Not really' " when asked if his ability to be impartial would be impaired by the fact that he had been robbed at knifepoint, his mother had been struck by a hit-and-run driver, and he had friends who had been burglarized and beaten. *Id.* The third juror had answered " 'I don't think so' " when asked if his ability to be fair would be affected by the fact that he had the experiences of being robbed and having his car stolen and that his mother and wife had been victims of rape. *Id.* The appellate court stated that these three jurors' experiences as crime victims and their equivocation and expression of self-doubt upon being asked if they could be fair and impartial meant the trial court had erred in denying cause challenges as to them. *Id.* at 725.

¶ 77     In *Delgado*, the court was presented with a challenge to a trial court's denial of a motion to strike a prospective juror for cause in a case against the defendant for possession of a controlled substance with intent to deliver. *Delgado*, 231 Ill. App. 3d at 120. In *dicta*, the court noted that the

prospective juror had made equivocal statements similar to those that led to reversal in *Daniel Johnson*. In response to questions about whether he could be impartial despite a close friend of his father's having died of a drug overdose, the prospective juror in *Delgado* had given answers such as " 'I sometimes wonder if I could be impartial. I would like to be able to tell you I could, but personal feelings—' " and " 'I just don't know.' " *Id.* However, the appellate court held that the trial court's denial of the challenge for cause was not reversible error because the prospective juror was excused pursuant to a peremptory strike and thus did not serve on the jury. *Id.* at 121.

¶ 78    We question the continued precedential value of *Daniel Johnson* (and by extension *Delgado*) on this issue in light our supreme court's addressing of a similar issue the following year in *Andrew Johnson*. There, a defendant convicted of murder and other offenses appealed the trial court's denial of his cause challenge to a prospective juror based on allegedly equivocal responses regarding that juror's ability be impartial despite having two brothers-in-law who were police officers and personal experiences with burglaries occurring at his mother's residence. *Andrew Johnson*, 149 Ill. 2d at 136. Asked if having those relationships or experiences would affect his ability to be fair and impartial, the juror had given answers such as " 'No, I don't think so,' " " 'I don't think so. I don't know,' " and " 'I would try, um-huh.' " *Id.* at 136-37. The juror also denied that there was any reason he could not be a fair and impartial juror. *Id.* at 137. In rejecting the defendant's challenge that these answers were too equivocal to qualify him to serve as a juror, the supreme court characterized them as "simply the particular idioms by which many people speak." *Id.* The supreme court found nowhere in these answers "any indication that he would not view the defendant in an objective, fair and impartial manner." *Id.* at 137-38. The supreme court stated that "[a]bsolute certainty is not required, nor will the mere suspicion of bias be sufficient to dismiss a venire member." *Id.* at 138 (citing *Cole*, 54 Ill. 2d at 415).

¶ 79     We find this case to be more similar to *Andrew Johnson* than to *Daniel Johnson*, *Delgado*, or any of the earlier cases cited to us by the defendants. Under the principles set forth in *Andrew Johnson*, we find that the aspirational statements by Olmos and Rivera that they would be able to set aside their own experiences and decide the case based on the evidence when the time came were not disqualifying, even though they were not expressed with absolute certainty.

¶ 80     The defendants acknowledge that a juror's equivocal responses are not necessarily a basis to strike a juror for cause, but they contend that this principle applies only if the juror later promises to disregard a stated bias. They contend that Rivera and Olmos failed to make such promises in this case. Indeed, our supreme court has set forth this rule both ways. Compare *People v. Hobley*, 159 Ill. 2d 272, 297 (1994) ("An equivocal response by a prospective juror does not necessitate striking the prospective juror for cause where the prospective juror later states that he will try to disregard his bias"), with *People v. Buss*, 187 Ill. 2d 144, 187 (1999) ("an equivocal response does not require that a juror be excused for cause"), and *Williams*, 173 Ill. 2d at 67 (similar)). In our view, the question does not turn on whether a juror made a specific promise but involves consideration of all of the principles set forth above. We reiterate that the burden is on the party challenging a prospective juror for cause to show the actual existence of a disqualifying state of mind as will raise the presumption of partiality. *Andrew Johnson*, 149 Ill. 2d at 138 (citing *Cole*, 54 Ill. 2d at 413). The defendants failed to make such a showing in this case as to Rivera and Olmos, and the trial court's denial of their challenges for cause was not contrary to the manifest weight of the evidence.

¶ 81                              *3.* Batson *Challenges*

¶ 82     The defendants' second argument is that the trial court erred in sustaining the plaintiffs' *Batson* challenges to the defendants' attempted exercise of peremptory strikes as to Rivera and

Olmos. The defendants argue that the trial court's error was twofold and sequential. First, they contend, the trial court employed an improper framework of analysis by finding that the plaintiffs made a *prima facie* case without resort to the seven-factor test set forth by our supreme court. Second, they contend that the trial court had no reason to disregard their proffered race-neutral reasons as pretext for purposeful discrimination.

¶ 83     The principle of *Batson*, which is applicable in civil cases, prohibits the use of peremptory challenges to purposefully exclude prospective jurors on the basis of their race. *McDonnell v. McPartlin*, 192 Ill. 2d 505, 526 (2000). In *Batson*, the United States Supreme Court set forth a three-step framework for evaluating a claim that peremptory challenges are being exercised in a discriminatory manner. First, the challenging party must establish a *prima facie* case of purposeful discrimination. Second, if a *prima facie* case is made, the burden shifts to the opposing party to articulate a race-neutral reason for striking the prospective juror in question. Third, the trial court makes a determination whether the party making the *Batson* claim has carried its burden of establishing purposeful discrimination. See *Batson*, 476 U.S. at 96-98; see also *McDonnell*, 192 Ill. 2d at 526; *People v. Rivera*, 221 Ill. 2d 481, 500 (2006).

¶ 84     To determine at the first step whether racial bias motivated a party's decision to exercise a peremptory strike against a prospective juror, "a court must consider 'the totality of the relevant facts' and 'all relevant circumstances' surrounding the peremptory strike to see if they give rise to a discriminatory purpose." *People v. Davis*, 231 Ill. 2d 349, 360 (2008) (quoting *Batson*, 476 U.S. at 93-94). The threshold for making out a *prima facie* claim under *Batson* is "not high," as a party " 'satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.' " *Id.* (quoting *Johnson v. California*, 545 U.S. 162, 170 (2005)). Our supreme court has articulated a list of seven factors

relevant in evaluating whether a *prima facie* claim has been shown:

> "(1) the racial identity between the party exercising the peremptory challenge and the excluded venirepersons; (2) a pattern of strikes against [Hispanics] on the venire; (3) a disproportionate use of peremptory challenges against [Hispanics]; (4) the level of [Hispanic] representation in the venire compared to the jury; (5) the prosecutor's questions and statements of the challenging party during *voir dire* examination and while exercising peremptory challenges; (6) whether the excluded [Hispanic] venirepersons were a heterogeneous group sharing race as their only common characteristic; and (7) the race of the defendant, victim and witnesses." *Id.* at 362 (citing *Rivera*, 221 Ill. 2d at 501).

¶ 85    A trial court's ruling as to whether a party has made out a sufficient *prima facie* case of purposeful discrimination constitutes a finding of fact, and our standard of review as to this first step of analysis is whether the finding is against the manifest weight of the evidence. *Rivera*, 221 Ill. 2d at 502.

¶ 86    Only if a *prima face* case is demonstrated at the first step is the opposing party required at the second step to provide a race-neutral reason for its attempt to exercise a peremptory challenge against the juror in question. *Id.* at 501-02. And our supreme court has cautioned against collapsing these first two steps and requiring a race-neutral reason without a *prima facie* showing being made first. *Id.* at 500-01. Once a *prima facie* case is made and a race-neutral reason is provided, the challenging party may argue in rebuttal that the opposing party's proffered explanation is pretextual. *Davis*, 231 Ill. 2d at 363.

¶ 87    Finally, at the third step of analysis, "the trial court then weighs the evidence in light of the *prima facie* case, the [striking attorney's] reasons for challenging the venireperson, and any rebuttal by *** counsel" for the party opposing the peremptory strike. *People v. Easley*, 192 Ill.

2d 307, 324 (2000). "This final step involves evaluating 'the persuasiveness of the justification' proffered by the [attorney exercising the strike], but 'the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.' " *Rice v. Collins*, 546 U.S. 333, 338 (2006) (quoting *Purkett v. Elem*, 514 U.S. 765, 768 (1995)).

¶ 88    The defendants argue that the trial court acknowledged the proper framework of a *Batson* challenge but applied it improperly. Specifically, they first contend that the trial court found that the plaintiffs had shown a *prima facie* case of discrimination without properly considering or applying the seven factors articulated by our supreme court as relevant to the first step of a *Batson* analysis. They contend that the trial court's misapplication of these factors to the third step of the test was shown not only in its brief analysis of the challenges involving Olmos and Rivera, but also in its analysis of the three *Batson* challenges that preceded them. They emphasize that the only factor cited by the trial court was the existence of a pattern of strikes against Hispanic prospective jurors and that this factor was cited, not as a basis for finding a *prima facie* claim, but as a basis for disallowing both strikes.

¶ 89    We find no grounds for concluding that the trial court employed an improper analysis of the *Batson* challenges involving Olmos or Rivera. It is clear from the trial court's comments addressing the first *Batson* challenge involving Mora one day earlier that the trial court was fully aware of the three steps of a *Batson* challenge and the seven factors relevant to the determination as identified by our supreme court. Thus, despite the order of its comments, we have no doubt that the trial court had these factors in mind when it concluded that the plaintiffs had made a *prima facie* showing of discrimination. We believe the order in which the trial court made its comments are more reflective of how this issue unfolded at trial than any misunderstanding about how to analyze a *Batson* challenge. In other words, the defendants' attorney identified four prospective jurors at

once against whom he intended to exercise peremptory challenges, all of whom were Hispanic. Plaintiffs' counsel immediately raised *Batson* challenges on the basis that "all four are Hispanic." Despite the attorneys' attempts to address the strikes and *Batson* challenges involving all four jurors together, the trial court conscientiously emphasized that each peremptory strike and *Batson* challenge needed to proceed one-by-one. Furthermore, all of this followed directly on the heels of cause challenges against these same four jurors, meaning that all of the attorneys and the trial court were largely aware of the defendants' explanations for wanting these jurors stricken.

¶ 90    Additionally, the trial court was insistent that it did not conduct its analysis in the manner that the defendants now contend that it did. When the defendants made this same argument in the context of their motion to reconsider, the trial court stated that despite discussing the seven factors after the defendants had given a race-neutral explanation for the striking of the jurors, it had considered the factors as bearing upon the *prima facie* step of the analysis. It stated that "every single time[,] this Court always considered those factors. I always did. Okay. And I always made the initial finding, and then it went back to you," referring to the defendants and their second stage proffering of a race-neutral explanation for the strike. The trial court went on to acknowledge that it could understand why the defendants' position was "that the court should have, when making the finding, talked about the factors at that moment in time and then go[ne] to step two. But the court always considered factors. That's my position, the Court's position, but I know that I did." A trial court is presumed to know the law and to apply it properly, absent an affirmative showing to the contrary in the record. *In re N.B.*, 191 Ill. 2d 338, 345 (2000). We find that the trial court was very conscientious and thorough in considering the multiple *Batson* challenges in this case, and we conclude that the defendants have failed to make an affirmative showing that overcomes the presumption that the trial court applied the law properly in this context.

¶ 91     The defendants argue that even if the seven factors were considered as part of the trial court's *prima facie* analysis, the fact that the defendants had attempted to exercise four peremptory strikes in a row against Hispanic jurors prior to the time Olmos was under consideration is an insufficient basis upon which to conclude that a *prima facie* case of discrimination had been shown. We disagree. A pattern of strikes exists where peremptory strikes affect members of a certain race to such a degree or with such a lack of apparent nonracial motivation that it suggests the possibility of racial motivation. *People v. Andrews*, 146 Ill. 2d 413, 429 (1992). In *Andrews*, our supreme court found the fact that the prosecution had used all its peremptory challenges to exclude African American venirepersons was strongly suggestive of racial motivation and thus constituted a pattern for purposes of a *prima facie* showing. *Id.* at 428-29.

¶ 92     In this case, at the time that the defendants attempted to exercise a peremptory challenge as to Olmos, it constituted their fifth consecutive attempt to exercise a peremptory strike of a prospective juror who was Hispanic in a case where the plaintiffs were also Hispanic. The record further indicates that as of that time, the defendants had attempted to exercise peremptory challenges only against Hispanic prospective jurors and had not attempted to exercise any peremptory challenges against prospective jurors who were not Hispanic. Although we acknowledge the defendants' assertion that one or two of the jurors seated in the interim were Hispanic, the trial court, which had the benefit of firsthand observation, seemed to agree with the plaintiffs that they were not. This is simply not something we are able to resolve from the transcript. We do find, however, that the trial court was very conscientious in addressing the multiple *Batson* challenges each time one occurred. When the issue was raised upon the second and third instances of the peremptory striking of a Hispanic juror, the trial court found that no pattern yet existed; but by the fifth and sixth consecutive instance, it found that a pattern had

unfolded and been shown. Again, the trial court had the benefit of firsthand observations of the entirety of jury selection and the demeanors of everyone involved. We conclude that the evidence of Olmos being the fifth consecutive instance of a peremptory strike being exercised against a Hispanic juror (and Rivera being the sixth) is a sufficient basis from which the trial court could draw an inference that discrimination was occurring, thereby satisfying the standard for making out a *prima facie* claim under *Batson.* See *Davis*, 231 Ill. 2d at 360. As noted by our supreme court, the threshold for doing so is "not high." *Id.* Accordingly, we hold that the trial court's conclusion that the plaintiffs had established a *prima facie* claim of discrimination is not contrary to the manifest weight of the evidence.

¶ 93     We find inapposite the case upon which the defendants rely, *Fleming v. Moswin*, 2012 IL App (1st) 103475-B. In that case, the majority found no discernible pattern of discrimination where a defendant accepted the first African American venireperson tendered to him, struck a second, accepted a third who was subsequently stricken by the plaintiffs, and then accepted two more before moving to strike the prospective juror who was the subject of the *Batson* challenge. *Id.* ¶ 57. The pattern here of attempting to exercise five and then six peremptory strikes in a row against jurors of the same Hispanic race as the plaintiffs, while using none against prospective jurors of any other race, appears far more indicative of discrimination than the situation in *Fleming*.

¶ 94     The defendants' next argument with respect to *Batson* is that the trial court erred in its third-step ruling by rejecting their proffered race-neutral reasons for striking Olmos and Rivera without explaining or articulating any reason for doing so. Again, their proffered race-neutral reasons were that both prospective jurors had given equivocal answers about whether they could be fair and impartial, and Olmos had a funeral to attend that would delay the trial by one day. The defendants assert that the plaintiffs did not provide the trial court with any reason to doubt that the defendants'

reasons were genuine, and the trial court failed to set forth any such reasons when ruling. The defendants also contend that the trial court relied solely upon its previous identification of a pattern of discrimination, thereby merely reiterating one of the factors relevant to the establishment of a *prima facie* case.

¶ 95    In resolving this issue, it is helpful to set forth in some detail both the nature of the determination that a trial court is called upon to make at the third step of a *Batson* analysis, as well as principles set forth by both the Illinois Supreme Court and the United States Supreme Court concerning appellate review of the third-step ruling. Prior to doing so, we acknowledge that the defendants argue that we should review this issue *de novo* on the basis that the trial court misapplied the *Batson* analysis. See *People v. Talley*, 2023 IL App (4th) 221013, ¶¶ 22-24. However, based upon our holding above that the trial court conducted a proper *Batson* analysis, we decline to review this issue under standards different than those established by the higher courts, as set forth below.

¶ 96    The question for the trial court at the third step of *Batson* is whether the party opposing exercise of the peremptory strike has carried its burden of proving purposeful discrimination. *Mack v. Anderson*, 371 Ill. App. 3d 36, 47 (2006). As stated above, at this step the trial court "weighs the evidence in light of the *prima facie* case, the [striking attorney's] reasons for challenging the venireperson, and any rebuttal by *** counsel" for the party opposing the peremptory strike. *Easley*, 192 Ill. 2d at 324. The "critical question" before the trial court at this step is the "persuasiveness" of striking attorney's justification for using the strike. *Mack*, 371 Ill. App. 3d at 47 (citing *Miller-El v. Cockrell*, 537 U.S. 322, 338-39 (2003)). The trial court must assess the genuineness of the reason given by the striking attorney along with that attorney's credibility in offering the explanation. *People v. Martinez*, 335 Ill. App. 3d 844, 853 (2002). It must also "assess

the plausibility of that reason in light of all evidence with a bearing on it." *Miller-El v. Dretke*, 545 U.S. 231, 252 (2005); see *Flowers v. Mississippi*, 588 U.S. 284, 302 (2019) (trial court must consider proffered race-neutral explanation "in light of all of the relevant facts and circumstances" and arguments of the parties).

¶ 97    Given the focus of this inquiry, a trial court's third-step finding on the ultimate issue of discrimination rests largely on credibility determinations. *McDonnell*, 192 Ill. 2d at 527. Our supreme court has stated:

"As the Supreme Court observed in *Hernandez v. New York*, 500 U.S. 352, 365 (1991), there will seldom be much evidence bearing upon the ultimate question of discrimination and the 'best evidence often will be the demeanor of the attorney who exercises the challenge.' The evaluation of the attorney's state of mind is most often 'based on demeanor and credibility' and thus 'lies "peculiarly within the trial judge's province." ' *Hernandez*, 500 U.S. at 365, quoting *Wainwright v. Witt*, 469 U.S. 412, 428 (1985). As the Supreme Court acknowledged in *Hernandez,* the credibility of the attorney's explanation 'goes to the heart of the equal protection analysis, *and once that has been settled, there seems nothing left to review.*' (Emphasis added.) *Hernandez*, 500 U.S. at 367." *Rivera*, 221 Ill. 2d at 502.

¶ 98    Our supreme court has further recognized that "a race-neutral reason for a challenge often invokes a juror's demeanor (*e.g.,* nervousness, inattention, the way words are emphasized to express differing meanings), making the trial court's firsthand observations of crucial importance." *Davis*, 231 Ill. 2d at 363-64. "In such situations, the trial court must evaluate not only whether the [striking attorney's] demeanor belies discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the [striking attorney]." *Id.* at 364 (citing *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008)).

¶ 99    Because the trial court's firsthand observations of these matters are of such crucial importance to the third-step determination, "a reviewing court must defer to the trial court absent 'exceptional circumstances.' " *People v. Crawford*, 2013 IL App (1st) 100310, ¶ 103 (quoting *Hernandez*, 500 U.S. at 366). The trial court's ruling on the ultimate question of discrimination is a finding of fact (*People v. Hudson*, 157 Ill. 2d 401, 426 (1993)), which must be upheld by a reviewing court unless it is clearly erroneous. *Crawford*, 2013 IL App (1st) 100310, ¶ 103 (citing *Snyder*, 552 U.S. at 477). Under the clear error standard of review, we may not reverse unless we are left with a definite and firm conviction that a mistake has been committed. *Id.* (citing *Hernandez*, 500 U.S. at 369).

¶ 100    Bearing in mind the above standards, we cannot say in this case that it was clearly erroneous for the trial court to sustain the plaintiffs' *Batson* challenges to the defendants' attempted striking of Olmos and Rivera. As we have already recognized, the attempted strikes of Olmos and Rivera constituted, respectively, the fifth and sixth consecutive instances in which the defendants had attempted to exercise peremptory strikes of prospective jurors of the same Hispanic race as the plaintiffs. They also followed directly after cause challenges involving four of these same Hispanic jurors. No strikes had been exercised against any jurors of any other race, and (although the defendants dispute this) there is no clear evidence that any of the jurors seated in the interim were Hispanic. Against these facts, it was the purview of the trial court to assess whether purposeful discrimination was occurring in the case before it. It was for the trial court to assess from the totality of circumstances whether the defendants had merely gotten a "bad draw" in jury selection such that by coincidence six prospective jurors in a row whom they would have stricken regardless of race all happened to be Hispanic in a case with Hispanic plaintiffs? Or was something invidious occurring in which the defendants' true reason for wanting them stricken from the jury involved

their race? The *Batson* analysis vests in the trial court the responsibility of assessing the defendants' attorney's state of mind on this question, based on demeanor, credibility of argument, and all other facts bearing upon the issue. In this case, after weighing these factors in considering the arguments as to Olmos and Rivera, the trial court's finding was that defendants' striking of them constituted "purposeful discrimination in that context in that moment in time" when the strikes were exercised. Given the importance of its credibility assessment to this ruling, we cannot say it was clearly erroneous under the facts of this case.

¶ 101     We recognize the defendants' argument that the trial court provided minimal additional explanation as to its basis for not accepting defendants' counsel's proffered race-neutral reasons for striking of Olmos and Rivera. However, the defendants cite no Illinois authority that the trial court was required to explain its reasoning. The Second Circuit has held that, "[a]s long as a trial judge affords the parties a reasonable opportunity to make their respective records, he may express his *Batson* ruling on the credibility of a proffered race-neutral explanation in form of a clear rejection or acceptance of a *Batson* challenge." *Messiah v. Duncan*, 435 F.3d 186, 198 (2d Cir. 2006); see *Miller-El*, 537 U.S. at 347 ("a state court need not make detailed findings addressing all the evidence before it" to render a proper *Batson* ruling). The determination that the trial court was called upon to make was primarily one of credibility that turned on the demeanor of the attorneys and jurors in the case before it. As such, any failure to further explain the basis of its ruling is not grounds for reversal in this instance.

¶ 102     Also, we reject the defendants' argument that the trial court looked solely to a pattern of discrimination (*i.e.*, a factor of the first step of analysis) in reaching its ultimate conclusion at the third step of analysis. Although some of the trial court's statements made in the midst of jury selection could be said to lack precision, we believe they reflect its appropriate consideration of

the totality of the evidence and arguments bearing on the issue of discrimination. See *Miller-El*, 545 U.S. at 252; *Flowers*, 588 U.S. at 302. In its ruling as to Olmos, the court stated that "you can provide a race neutral application [*sic*], but when I look at the pattern here and the factors and the venire and the jury and all those things that the law requires me to do," the *Batson* challenge is sustained. Similarly, in shortly thereafter sustaining the challenge as to Rivera, it stated, "[Y]ou've shown there's a race neutral explanation, but the totality of the circumstances doesn't change here. You're still doing the same thing." And the following day, in denying the motion for reconsideration, it clarified, "[B]y me sustaining it, obviously, the finding is of purposeful discrimination in that context in that moment in time. *** I didn't use those words. I agree with that, but by virtue of sustaining the objection, *** by operation of law, that's the finding." While the trial court may have found the pattern of consecutive striking of Hispanic jurors to be the strongest evidence within the totality of circumstances bearing upon the issue of purposeful discrimination, we do not interpret the trial court's ultimate ruling to have been based upon this evidence alone or insufficient for that reason.

¶ 103    Finally, we reject the argument that the defendants were "vindicated" in their stated explanations for wanting Olmos and Rivera stricken because Hernandez, after initially being sworn as a juror, approached the trial court and volunteered that she had been untruthful that she would be openminded about the evidence. The trial court dismissed Hernandez on the basis that her volunteered statement was too problematic to allow her to continue to serve. We find the fact that Hernandez approached the court and made this statement after the trial court had ruled upon the *Batson* challenges at issue to be irrelevant to the rulings involving Olmos and Rivera. In denying the motion for reconsideration, the trial court reiterated that its later excusing of Hernandez did not change its determination that the striking of Olmos and Rivera had constituted purposeful

discrimination in the context and at the time it had occurred. As stated above, we do not find this ruling to be clearly erroneous.

¶ 104                                    B. Jury Instruction

¶ 105        The defendants next argue that they were unfairly prejudiced by the trial court's rejection of the modified jury instruction that they tendered on the topic of proximate causation, which included language instructing the jury specifically as to sole proximate cause. They assert that they presented evidence in this case that the sole proximate cause of the minor plaintiff's spinal cord injury was acute flaccid myelitis.

¶ 106        Civil litigants are entitled to have the jury instructed upon each theory that was supported by the evidence. *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 100 (1995). Generally speaking, all that is required to justify the giving of a jury instruction is that there be some evidence in the record, even if insubstantial, to justify the theory of the instruction. *Heastie v. Roberts*, 226 Ill. 2d 515, 543 (2007). The determination of what issues have been raised by the evidence is within the discretion of the trial court. *Leonardi*, 168 Ill. 2d at 100. Similarly, decisions about which jury instructions to use are within the discretion of the trial court and will not be disturbed unless the trial court has abused its discretion. *Heastie*, 226 Ill. 2d at 543.

¶ 107        A trial court is required to use the applicable jury instructions contained within the Illinois Pattern Jury Instructions, Civil (hereinafter IPI), unless the court determines that an instruction does not accurately state the law. Ill. S. Ct. R. 239(a) (eff. Apr. 8, 2013). If a pattern instruction does not accurately state the law, then the court may instruct the jury pursuant to a nonpattern instruction. *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 273 (2002). Our standard for determining whether a trial court abused its discretion is whether, considered as a whole, the instructions fairly, fully, and comprehensively apprised the jury of the

relevant legal principles. *Id.* at 273-74. We will not reverse due to the giving of faulty jury instructions unless they clearly misled the jury and resulted in prejudice to the defendants. *Id.* at 274; accord *Studt v. Sherman Health Systems*, 2011 IL 108182, ¶ 28 (reversal is warranted only if the instructional error resulted in " 'serious prejudice' " to the defendant's right to a fair trial).

¶ 108      In this case, the trial court instructed the jury on proximate causation by use of the current IPI-approved instruction on this topic as it was revised in 2021. See IPI Civil No. 15.01. The instruction given by the trial court stated:

"When I use the expression 'proximate cause,' I mean a cause that, in the natural or ordinary course of events, produced the plaintiffs' injury. It need not be the only cause, nor the last or nearest cause. It is sufficient if it combines with another cause resulting in the injury.

If you decide that the defendants were negligent and that their negligence was a proximate cause of injury to [the minor plaintiff], it is not a defense that something else may also have been a cause of the injury. However, *if you decide that the defendant's conduct was not a proximate cause of [the minor plaintiff's] injury*, then your verdict should be for the defendant." (Emphasis added.)

¶ 109      The defendants argue that the trial court erred in giving the above instruction and by rejecting their modified version of IPI Civil No. 15.01. That rejected instruction stated:

"When I use the expression 'proximate cause,' I mean a cause that, in the natural or ordinary course of events, produced the plaintiff's injury. It need not be the only cause, nor the last or nearest cause. It is sufficient if it combines with another cause resulting in the injury. If you decide that a defendant was negligent and that defendant's negligence was a proximate cause if injury to the plaintiff, it is not a defense that something else may also have

been a cause of the injury. However, *if you decide that the sole proximate cause of injury to the plaintiff was something other than the conduct of a defendant*, then your verdict should be for that defendant." (Emphasis added.)

¶ 110    The pertinent difference between these two instructions is the last sentence. The defendants' tendered instruction modified the current version of IPI Civil No. 15.01 by replacing its last sentence with the bracketed language concerning sole proximate cause that, prior to 2021, was included as part of the "long form" of former IPI Civil No. 12.05, which stated:

"If you decide that a [the] defendant[s] was [were] negligent and that his [their] negligence was a proximate cause of injury to the plaintiff, it is not a defense that something else may also have been a cause of the injury.

[However, if you decide that the sole proximate cause of injury to the plaintiff was something other than the conduct of the defendant, then your verdict should be for the defendant.]"

¶ 111    The defendants argue that they were entitled to have the jury instructed specifically as to sole proximate cause in this case and that IPI Civil No. 15.01 given by the trial court failed to do this. They contend that the instruction given was incomplete, in that it conveys the general proposition that evidence of another proximate cause is not a defense but omits the specific exception for evidence that something else is the "sole" proximate cause. If the jury is told only of the general proposition but not the specific exception, the defendants contend, then it does not matter that the jury might conclude something else is the sole proximate cause; having been told that evidence of another cause is not a defense to liability, the jury will presumably follow the general principle and award a plaintiff's verdict. The defendants contend that their tendered instruction would have clarified this point, without which the jury could not be expected to understand or apply the

exception for sole proximate cause.

¶ 112 After the trial and during briefing of this appeal, an argument similar to that advanced by the defendants here was met with acceptance by a panel of this court. See *Johnson v. Advocate Health & Hospitals Corp.*, 2025 IL App (1st) 230087, ¶¶ 58-60. The court in *Johnson* held that a trial court had erred by refusing a defendant's tendered instruction that modified IPI Civil No. 15.01 in a manner similar to the instruction tendered by the defendants in the present case. *Id.* ¶¶ 20-22, 60. In its reasoning, the court relied on our supreme court's recognition that

> " '[a] defendant has the right *not only* to rebut evidence tending to show that defendant's acts are negligent and the proximate cause of claimed injuries, *but also* has the right to endeavor to establish by competent evidence that the conduct of a third person, or some other causative factor, is the sole proximate cause of plaintiff's injuries.' " (Emphases in original.) *Id.* ¶ 58 (quoting *Leonardi*, 168 Ill. 2d at 101).

¶ 113 The court reasoned that the two distinct rights possessed by defendants as set forth in the above quote from *Leonardi* make it clear that, "when supported by the evidence, a defendant is entitled to an explicit instruction 'that the conduct of a third person, or some other causative factor, is the sole proximate cause of plaintiff's injuries.' " *Id.* ¶ 59 (quoting *Leonardi*, 168 Ill. 2d at 101). Thus, the court found that, while the current version of IPI Civil No. 15.01 is an accurate statement of the law on proximate cause in general, it fails to state the law regarding the sole proximate cause defense with the specificity that *Leonardi* requires. *Id.* Despite this holding, however, the court found that the defendant had suffered no serious prejudice from the giving of the unmodified version of IPI Civil No. 15.01, which was not clearly misleading. *Id.* ¶ 72. The court reasoned that the defendant's attorney was able to make a sole proximate cause argument that was "abundantly clear" to the jury in accordance with the unmodified instruction. *Id.* ¶ 70.

¶ 114     The plaintiffs argue that we do not need to reach the issue of whether the current version of IPI Civil No. 15.01 is an incomplete statement of the law concerning sole proximate cause. They raise multiple arguments in this regard. First, they contend that the defendants forfeited this claim of error by failing to raise the contention in the trial court in the way that they are now arguing it on appeal. Second, they contend that any error is moot because the defendants made no attempt in closing arguments to argue that acute flaccid myelitis was a sole proximate cause of the injury in this case and thus suffered no prejudice from the jury not being instructed on this topic. Third, they argue that Dr. Licht merely presented acute flaccid myelitis as a possible alternative explanation, and he did not express an opinion a reasonable degree of medical certainty that it was in fact the sole proximate cause of the minor plaintiff's spinal cord injury.

¶ 115     These points by the plaintiffs are well taken. In the trial court, defendants' counsel never advanced the specific objection or argument that the evidence of this case warranted instructing the jury on sole proximate cause. A party forfeits the right to object to jury instructions when the party fails to make a specific objection during the jury instruction conference. *Colella v. JMS Trucking Co.*, 403 Ill. App. 3d 82, 95 (2010); accord *Givens v. City of Chicago*, 2023 IL 127837, ¶ 76. This requirement ensures that the trial court has the opportunity to correct a defective instruction and to prevent the challenging party from gaining an unfair advantage by failing to act at a time when the trial court could remedy the faulty instruction and then obtaining a reversal on appeal. *Mikolajczyk v. Ford Motor Co.*, 231 Ill. 2d 516, 557-58 (2008).

¶ 116     At the jury instruction conference, when defendants' counsel objected to the unmodified version of IPI Civil No. 15.01 and argued in favor of the defendants' modified version, the argument went as follows:

          "[THE COURT:] Plaintiffs' proposed No. 15 is the 15.01, proximate cause instruction.

Any objection?

MR. PINTO [(DEFENDANTS' ATTORNEY)]: Judge, we have *** an alternative proximate cause instruction that we are offering based on the fact that the IPI was recently modified to, in our view, misdefine proximate cause and sole proximate cause. So we've offered an instruction on proximate cause based on the *Leonardi* case and the *McDonald* case as cited in our draft that we think accurately states the law when it comes to proximate cause and sole proximate cause.

*** 

THE COURT: Yeah, I see the distinction that you're offering. So what's Plaintiffs' response?

MR. HOLDEN [(PLAINTIFFS' ATTORNEY)]: Plaintiffs' response, Your Honor, is that the IPI was updated by the Supreme Court to reflect changes in the law specifically with regard to sole proximate cause. We believe that the IPI accurately sets forth the law on the issue and should be given over a non-IPI instruction.

THE COURT: The Court agrees with that proposition. The 15.01 as currently stated in the IPI is a reflection of how—I understand there's some disagreement on this, but the Court will approve the IPI long form version of the 15.01 proximate cause instruction over objection.

Defendants' proposed 15.01 proximate cause instruction based on their proposed use of the 15.01 is denied."

¶ 117    The argument by defendants' counsel in the above exchange was merely a boilerplate objection to the revised version of the instruction. There was no mention in it that defendants were of the position that they were entitled under the evidence to the sole proximate cause language by

which they had modified the pattern instruction. They did not assert that they would be hampered in making their argument to the jury in the absence of this language. The omission of this argument is significant. The "Notes on Use" to the current IPI Civil No. 15.01 indicate that its last paragraph is to be given in its entirety where there is evidence tending to show that the conduct of the defendant was not a proximate cause of the occurrence, and the conduct of third persons or outside instrumentalities was the proximate cause of the occurrence. IPI Civil No. 15.01, Notes on Use (rev. Aug. 2021). This is in contrast to former IPI Civil No. 12.05. The "Notes of Use" to that former instruction provided that its bracketed last sentence "should be used only where there is evidence tending to show that the sole proximate cause of the occurrence was something other than the conduct of the defendant." Former IPI Civil No. 12.05, Notes on Use (approved Dec. 8, 2011, withdrawn Aug. 2021). Accordingly, when the "long form" of former IPI Civil No. 12.05 was tendered by a defendant, it would usually result in argument and a ruling by the trial court about whether the evidence justified instructing the jury on sole proximate cause using the language of that bracketed last sentence.

¶ 118    That did not occur in this case. In other words, defendants' counsel's argument concerning the parties' respective versions of IPI Civil No. 15.01 was not made in a way that prompted any argument by the attorneys or ruling by the trial court about whether the evidence of this case warranted language that was, in effect, the bracketed last sentence of former IPI Civil No. 12.05. This is evident by the fact that this court now finds itself placed in the position of determining in the first instance whether the evidence justified instructing the jury on sole proximate case, where this issue appears never to have been raised in the trial court in any meaningful way.

¶ 119    Even if we did not find forfeiture, however, we find no abuse of discretion in the trial court's refusal of a sole proximate cause instruction in this case. Defendants are entitled to a sole

proximate cause instruction only when there is competent evidence to support the theory that someone or something other than the defendants' negligence was the sole proximate cause of the plaintiff's injury. *Brdar v. Cottrell, Inc.*, 372 Ill. App. 3d 690, 704 (2007) (citing *Leonardi*, 168 Ill. 2d at 101). In this case, Dr. Licht presented acute flaccid myelitis only as a possible alternative explanation in light of his opinion that the plaintiffs' causation theory was impossible. Neither he nor any other medical witness testified to a reasonable degree of medical certainty that it was in fact the sole proximate cause of the minor plaintiff's spinal cord injury.

¶ 120    In the passage cited to us by the defendants, Dr. Licht's testimony was as follows:

"Q. I want to be fair about this and make sure we're fair and complete. Are you telling the jury that you're a hundred percent certain that this is acute flaccid myelitis, and that's what caused this paralysis in this case?

A. No.

Q. Why are you offering acute flaccid myelitis as a possibility that it could have occurred in this case, if you can't be a hundred percent sure?

A. Because mostly I can't explain the injury by a vascular mechanism. By that, I mean blood flow oxygen delivery, so then you have to go looking for other explanations. What sort of things happen to the spinal cord are inflammatory, infectious, and oncologic process. Oncologic meaning cancer. There's no evidence of a cancer on the MRI. So then you're left with just inflammation or infection. I think there's a reasonable explanation in infection.

Q. Between those two possibilities, let's say there's no direct flow to the lower body, there's little or no collateral circulation to the body that somehow only affects T-11 to the conus and spares everything else, on the other hand something like an infectious cause  that you talked about, which is more likely?

A. Right, so I mean all things are unlikely, including injury to the spinal cord. It happens very rarely in pediatrics. It does happen, but very rarely.

So we're talking about the least likely versus things that happen very rarely, but I think infection is probably a better explanation for what happened to this child's spinal cord than a vascular accident.

Q. Is that in part based on your opinion regarding the likelihood or unlikelihood of the plaintiff's theory of the case?

A. Correct."

We conclude that Dr. Licht's merely offering acute flaccid myelitis as a "better explanation" does not rise to the level of causation testimony to a reasonable degree of medical certainty that would entitle the defendants to an instruction on sole proximate cause.

¶ 121     Our determination in this regard is bolstered by the way that defendants' counsel discussed Dr. Licht's testimony about acute flaccid myelitis during closing argument. He stated:

"So Dr. Licht necessarily having ruled out the plaintiffs' theory of the case, it can't be poor perfusion in the operating room. That's impossible. He starts to look for alternative causes, and he fully concedes that he can't specifically prove acute flaccid myelitis. He presented it to you as one possibility, all things being unlikely.

But here's one thing it could have been. It could have been a clot. It could have been an acute flaccid myelitis. We cannot say with certainty why this happened, as is often the case in medicine, but what we could say with virtual certainty is that plaintiffs' theory on causation that it happened in the operating room because of poor perfusion did not happen. It's impossible."

¶ 122     Despite the defendants' argument that current IPI Civil No. 15.01 is an incomplete

instruction, its language still allows for a sole proximate cause argument to be made. See *Johnson*, 2025 IL App (1st) 230087, ¶¶ 68, 70. Defendants' counsel did not attempt to do this. Instead, he acknowledged that acute flaccid myelitis had been presented as one alternative explanation for the minor plaintiff's injury but that there was not evidence to prove that this was the cause either. Defendants' counsel's statement was an accurate reflection of the evidence that was presented. However, the fact that there was no attempt to argue sole proximate cause in closing leads us also to find that the defendants suffered no serious prejudice from the trial court's refusal to give the jury instruction that they tendered on that issue. *Id.* ¶ 72; accord *Studt*, 2011 IL 108182, ¶ 28.

¶ 123                                                 C. Trial Errors

¶ 124        The defendants next argue that they were denied a fair trial by multiple errors involving the presentation of evidence and improper closing argument. We review trial court rulings pertaining to the presentation of evidence for abuse of discretion. *Troyan v. Reyes*, 367 Ill. App. 3d 729, 732 (2006). The abuse of discretion standard also applies to issues concerning the propriety of comments in closing argument. *Clarke v. Medley Moving & Storage, Inc.*, 381 Ill. App. 3d 82, 95 (2008). A timely objection is necessary to preserve an issue for appellate review. *Wodziak v. Kash*, 278 Ill. App. 3d 901, 914 (1996). Errors involving these matters will warrant reversal only where they were substantially prejudicial and affected the outcome of trial. *Simmons v. Garces*, 198 Ill. 2d 541, 566-67 (2002).

¶ 125                          *1. Comments about "Experimenting with Children"*

¶ 126        The defendants contend that the plaintiffs' counsel engaged in inflammatory conduct by his remarks to the effect that the defendants were "experimenting with children" when they performed aortic arch repair using selective cerebral perfusion at a temperature of 28 degrees instead of deep hypothermia. The defendants contend that these remarks by plaintiffs' counsel were an effort to

portray the procedure at issue as "something out of a horror movie" and draw comparison to "some of history's worst crimes against humanity." In doing this, the defendants contend, plaintiffs' counsel was attempting an improper appeal to the passions, emotions, and sympathies of the jury. They also argue that these were veiled exhortations to the jury to act for the safety of the community rather than to return a verdict based upon the evidence presented.

¶ 127    We reject this argument as meritless. In our review of the record, we find only one instance in which plaintiffs' counsel asked a question of Dr. Hammel on cross-examination whether he and other surgeons such as Dr. El-Zein were "experimenting with children" by performing selective cerebral perfusion at 28 degrees instead of using deep hypothermia. A defense objection to the question was overruled. Plaintiffs' counsel made this comment during a line of questioning about whether surgeons who in 2013 were moving away from the use of deep hypothermia to performing selective cerebral perfusion at 28 degrees had conducted animal studies or other testing to show that spinal cord was adequately protected under that newer technique. The question followed shortly after Dr. Hammel had agreed that he could not cite any literature to support the opinion that moderate or mild hypothermia provided superior or equal protection of the spinal cord as deep hypothermia. And later in his testimony on cross-examination, he acknowledged that he was not aware of any human study designed to show that it was safe to perform the procedure at 28 degrees. Furthermore, Dr. Wells had testified in the plaintiffs' case-in-chief that he was unaware of any published literature showing that the precise technique that the defendants used to perform the procedure on the minor plaintiff had been the subject of animal studies or other approved IRB testing. Accordingly, we do not find this isolated comment by plaintiffs' counsel to exceed the bounds of fair cross-examination based on this evidence.

¶ 128    In another instance, plaintiffs' counsel asked Urbas on cross-examination whether Dr. El-

Zein had experimented with using warmer temperatures during the surgery since she began working at the hospital. There was no reference to children in the question. However, defendants' counsel objected to the word experimented, and the trial court sustained the objection. Plaintiffs' counsel then re-asked the question with the word "innovate" substituted for "experiment," to which there was no objection. We find the trial court's sustaining of the objection to be sufficient to cure any error. *Allen v. Sarah Bush Lincoln Health Center*, 2021 IL App (4th) 200360, ¶ 192.

¶ 129    Finally, during closing arguments, plaintiffs' counsel stated that there had been "no data points, no studies or tests to show that not using deep hypothermia was safe on babies. Nobody had them. The hospital didn't have them. The literature doesn't have them." This followed an offhand comment by plaintiffs' counsel in which he stated he did not know the difference between experimenting or innovation but that he would "go with innovation." There was no objection to this comment. The failure to object to an allegedly improper comment during closing argument operates as a forfeiture of the objection. *Babikian v. Mruz*, 2011 IL App (1st) 102579, ¶ 13.

¶ 130    We reject the defendants' efforts to liken the comments in this case to those that led to reversal in *McCarthy v. Union Pacific R.R. Co.*, 2022 IL App (5th) 200377. There, the plaintiff's attorney stated in closing argument that the case before the jury was " 'about more than one man getting hurt at work' " but instead was an opportunity for the jurors " 'to do more for the safety of your community than you will likely ever again.' " *Id.* ¶ 66. The plaintiff's attorney then continued to make repeated comments urging the jury to use its verdict to enforce " 'safety rules' " for the purpose of protecting their community in the future and to show that their community ensures that those injured at work are not left wanting. *Id.* ¶¶ 69-74. The plaintiffs' attorney made remarks of this nature despite an order *in limine* prohibiting argument that the jury act as safety advocates or send a message to the corporate defendant with its verdict. *Id.* ¶¶ 64, 80. He also continued to make

these comments despite the trial court's repeatedly sustaining objections to them. *Id.* ¶ 80. The appellate court found that this repeated disregard of the trial court's rulings and the cumulative effects of the prejudicial comments deprived the defendants of a fair trial. *Id.* ¶¶ 80, 83.

¶ 131     We have reviewed plaintiffs' counsel's entire closing argument in this case. Nothing about the plaintiffs' counsel's comments in this case presented the kinds of problems that warranted reversal in *McCarthy*. We find that case to be of no aid to the defendants' argument here.

¶ 132                              *2. Medical Literature*

¶ 133     The defendants' next contention of trial error is that plaintiffs' counsel was improperly permitted to publish medical literature to the jury and to cross-examine defense experts with that literature without establishing the necessary foundation for doing so. Under Illinois law, medical literature cannot be used as substantive evidence but can be used for purposes of impeachment. *Fragogiannis v. Sisters of St. Francis Health Services, Inc.*, 2015 IL App (1st) 141788, ¶ 27. In general, cross-examination of an expert witness with statements from a recognized text or treatise is proper where either the court has taken judicial notice of the author's competence or, absent concession by the witness, the cross-examiner proves the text or treatise is authoritative. *Bowman v. University of Chicago Hospitals*, 366 Ill. App. 3d 577, 587 (2006).

¶ 134     The court finds it difficult to track the defendants' precise complaint about the use of medical literature in this case. They contend that plaintiffs' counsel waved undisclosed articles before the jury, but we find no reference in the record to such conduct. They contend that Dr. Licht was questioned on cross-examination about the 2009 article from the European Journal of Cardiothoracic Surgery without a foundation being established. However, Dr. Licht expressly testified that he agreed that this journal was reasonably reliable or a good source for practitioners. Furthermore Dr. Hammel testified that this was "a recognized journal."

¶ 135    They also contend that plaintiffs' counsel improperly questioned Vincent Olshove, Dr. Andrew Van Bergen, and Dr. Hammel on cross-examination without laying a proper foundation. As to Olshove and Dr. Van Bergen, however, our review of the record pages cited by the defendants show that the trial court sustained objections to the use of literature and that it did so outside the presence of the jury. No questions appear to have been posed to either of these witnesses involving medical literature on the record pages cited. As to Dr. Hammel, it appears that plaintiffs' counsel was attempting to establish through his testimony that a certain 2009 study published by Duke University was authoritative. Although counsel was unable to obtain a concession from the witness on this point, counsel's questioning in attempting to do so was not improper. It does not appear that counsel ever attempted impeachment of Dr. Hammel with reference to that Duke University study.

¶ 136    The defendants also contend that plaintiffs' counsel improperly attacked the credibility of Urbas, Olshove, and Dr. Hammel by accusing them of failing to bring research or literature with them to support their opinions. The defendants contend that it was improper and prejudicial to suggest that these witnesses should "have such material on their person." However, we find from our review of the record pages cited that plaintiffs' counsel's questioning merely confirmed that at no point in the litigation had the witnesses disclosed medical literature that would support their opinions. They were not questions about physically bringing literature into the courtroom. Furthermore, the defendants failed to object to the questions posed to Olshove and Dr. Hammel, and the trial court sustained the objection when plaintiffs' counsel asked Urbas to confirm that she "did not bring in any literature" to support an opinion that she could ignore certain labs.

¶ 137    We find no basis in the record for concluding that any prejudicial error occurred with respect to the use of medical literature in this case.

¶ 138                    *3. Criticisms of Non-Party Medical Providers*

¶ 139        The defendants contend that the trial court allowed the plaintiffs to elicit testimony critical of the care of the non-party nurses and physicians who provided care to the minor plaintiff following his surgery. They contend also that this improper testimony was elicited in the absence of any disclosed expert testimony that a failure on the part of these providers to identify the minor plaintiff's signs of paralysis after it occurred was a proximate cause of injury.

¶ 140        The defendants' argument on this point is presented in a highly summary fashion. They set forth seven examples of allegedly improper questioning in two sentences. We have reviewed all of the record pages cited by the defendants, and we find that objections were made in only two of these instances to preserve any error for review. See *Martinelli v. City of Chicago*, 2013 IL App (1st) 113040, ¶ 39. We address only those two points.

¶ 141        The first instance occurred during the questioning of nurse Yarger. One of the primary defenses to the plaintiffs' claim that the spinal cord injury occurred during the surgery of August 1, 2013, was that assessments made by multiple nurses during the postsurgical hospitalization through August 6, 2013, included findings indicating that the minor plaintiff had strength and movement in both of his lower extremities. In turn, one of the primary points of evidence relied upon by the plaintiffs was the fact that the nurses' cardiovascular assessments repeatedly documented no movement of the left lower extremity. Nurse Yarger's testimony was that her cardiovascular charting on this point, which contradicted her neurological charting of strength and movement in both lower extremities, had been a mistake.

¶ 142        Plaintiff's counsel asked nurse Yarger if it would be below the standard of care for her not to report abnormal findings of the lower extremities to the surgical team. The trial court sustained an objection to this question. She was then asked if it would be contrary to her professional obligations

as a nurse not to report an abnormal finding. The trial court overruled an objection to that question, and Yarger answered that she would be doing a poor job as a nurse if she did not report a change. We find that the trial court's sustaining of the objection cured any prejudice resulting from the improper question (see *Allen*, 2021 IL App (4th) 200360, ¶ 192) and that there was no abuse of discretion in allowing the second question as phrased.

¶ 143      The only other instance of a properly preserved objection occurred during the cross-examination of Dr. Van Bergen. He had testified on direct examination that it was not possible that he could have missed the fact that the minor plaintiff was not moving his lower extremities. On cross examination, plaintiff's counsel asked him whether he was aware that medical errors were made every day at his hospital. The trial court overruled an objection, and he answered that he was aware of this. We again find no abuse of discretion in this question on cross-examination. Even if it was error, this was a minor point that could not have affected the outcome of the case or resulted in substantial prejudice.

¶ 144                              *4. Admission of Hearsay Evidence*

¶ 145      The defendants argue that it was prejudicial error for the trial court to allow both plaintiffs to testify to hearsay. The rule against hearsay prohibits the admission of an out-of-court statement offered for the truth of the matter asserted. *Bafia v. City International Trucks, Inc.*, 258 Ill. App. 3d 4, 9 (1994).

¶ 146      The defendants argue that the rule against hearsay was violated when plaintiff Lucila Abraham was permitted to testify as to what Dr. Vogel had told her about her son's paralysis, which was that it was due to "a stroke through his spine." The trial court overruled their objection, stating, "It's not offered for the truth; it's offered just to show that the statement was made." The defendants argue that this ruling was error, as the only purpose of introducing this statement was

to bolster the argument that the minor plaintiff's paralysis was caused by the defendants during surgery. They reiterate that the timing of the minor plaintiff's paralysis was a hotly contested issue in the case.

¶ 147     For their part, the plaintiffs make no argument in support of the trial court's overruling of this objection. Instead, they simply argue that the defendants could not have suffered prejudice from allowing the plaintiff's testimony on this point because it was cumulative of the testimony of multiple medical witnesses to the effect that the surgery caused the spinal cord infarction. Also, the minor plaintiff's hospital chart that was admitted into evidence and discussed by the medical witnesses contained multiple entries to the effect that Lucila had knowledge that her son's injury had been caused by perioperative lack of oxygen supply to the spinal cord. Further, Dr. Vogel had already testified by this point of this case that his opinion was that the spinal cord injury was sustained during the surgery. We agree with the plaintiffs' argument. In light of the extensive causation testimony that was presented in this case, any hearsay testimony that Dr. Vogel told the plaintiff that her son had "a stroke through his spine" was immaterial.

¶ 148     The defendants similarly argue that the trial court erred in allowing plaintiff Jose Abraham to testify that his wife told him that she had reported concerns about their son's lack of movement in his legs prior to discharge and that a nurse had assured her that it was normal. The trial court overruled their hearsay objection. In doing so, the court stated, "She's a party." The defendants contend that the trial court erroneously relied upon the rule that statements of a party-opponent are not hearsay. See Ill. R. Evid. 801(d)(2) (eff. Oct. 15, 2015). They point out that the plaintiffs were not party-opponents of one another.

¶ 149     While we find the trial court's precise grounds for overruling this objection to be less than clear, we find that this testimony by Jose was properly allowed. An out-of-court statement offered

to prove its effect on a listener's mind or to show why he subsequently acted as he did is not hearsay and is admissible. *Fakes v. Eloy*, 2014 IL App (4th) 121100, ¶ 124. Immediately after testifying that his wife had been reassured by the nurses that their son's lack of leg movement was normal, plaintiff's counsel asked Jose how that made him feel. He answered that he felt better after she told him that it was normal. The effect of Lucila's statement on Jose's state of mind was relevant to the critical issues surrounding the timing of onset of paralysis. It went to the issue of why the plaintiffs waited until August 19, 2013, to take their son to the hospital if they believed he was not exhibiting leg movement immediately after his surgery. The statement was thus not hearsay.

¶ 150                    *5. References to Nontestifying Witnesses*

¶ 151        The defendants' final argument is that plaintiffs' counsel made improper remarks to the effect that the defendants had failed to call certain treating physicians whom neither side had disclosed as trial witnesses. It is generally improper for a party to comment upon an opponent's failure to call a witness who is not under the opponent's control or who is equally available to both parties. *Lebrecht v. Tuli*, 130 Ill. App. 3d 457, 484 (1985). Comments highlighting an opponent's failure to call such a witness are deemed improper due to the risk that the jury will presume the testimony would have been unfavorable to the opponent. *Id.*; accord *Wilson v. Moon*, 2019 IL App (1st) 173065, ¶ 50.

¶ 152        In this case, the minor plaintiff's medical records from Advocate Children's Hospital were admitted into evidence and used in the questioning of various expert witnesses. Certain entries in these medical records were cited by the plaintiffs' witnesses as suggesting a causal connection between the surgery and the spinal cord injury. The prime example appears to be an entry authored by treating physician Nida Yousef, M.D., concerning the reason for the minor plaintiff's hospital

admission on August 19, 2013. Dr. Yousef wrote that he had been evaluated by rehabilitation, neurology, and neuroradiology and that it was thought that he " 'has spinal cord injury likely secondary to his surgery.' "

¶ 153 During plaintiffs' counsel's opening statement, he referenced the above note along with others and stated, "These aren't my experts. This is the hospital after it happened." There was no objection to this comment. During the cross-examination of Urbas, she was asked about the above statement in Dr. Yousef's note. She acknowledged that it stated that Advocate's own physicians thought the injury was secondary to the surgery but added, "I'd be curious how they came to that conclusion." Plaintiffs' counsel then asked, "And if anybody from the hospital disagreed with their conclusion, they would be able to bring them in and explain that to the jury, right?" The trial court sustained an objection to this question. A nearly identical exchange occurred later in her cross-examination, and the trial court again sustained the objection.

¶ 154 During the cross-examination of Dr. Van Bergen, plaintiffs' counsel asked him whether he had read any of the records from the August 19, 2013, admission or talked to any of the physicians involved. After Dr. Van Bergen answered that he had not done so, plaintiffs' counsel made the gratuitous statement, "I guess we'll have to wait to hear from them." There was no objection.

¶ 155 Prior to closing arguments, the trial court entered an order upon the defendants' motion that neither side could comment on or argue that a particular witness should have been called or had not been called. During rebuttal closing, plaintiffs' counsel referenced the entries by Dr. Yousef and other treating physicians and stated, "If Advocate could have disputed these notes, don't you think they would have done so? Advocate called doctors and nurses who did not author those notes. Why? I'll leave for you to think about—" At that point, the trial court sustained an objection and instructed the jury to disregard the comment. Counsel then stated, "Advocate lawyers didn't even

have the Advocate doctors and lawyers [*sic*] they had testify to their own charting review these records that said the surgery team caused [the minor plaintiff's] paralysis." The trial court overruled a defense objection.

¶ 156      We disagree with the defendants' arguments that they suffered prejudice from the comments of plaintiffs' counsel as set forth above. In nearly all of the instances cited, either the trial court sustained an objection or no objection was made. Although the defendants argued that the trial court's sustaining of some objections failed to cure the prejudice, we disagree. The instances about which the defendants complain were a few isolated comments over the course of a trial that lasted over two weeks. This was not a situation where plaintiffs' counsel continued inappropriately to press an argument as to which the trial court continuously sustained objections. See *McCarthy*, 2022 IL App (5th) 200377, ¶¶ 80, 83. And as to the only comment above wherein the trial court overruled an objection, we find this to be a fair comment based upon the evidence that Dr. Van Bergen had not reviewed the records from the hospitalization that included the entry by Dr. Yousef.

¶ 157                    III. CONCLUSION

¶ 158      For the reasons set forth above, the judgment of the trial court is affirmed.

¶ 159      Affirmed.